Hilda DAWES et al., Plaintiffs,

v.

The PHILADELPHIA GAS COMMIS-
SION et al., Defendants.

Civ. A. No. 73–2592.

United States District Court,
E. D. Pennsylvania.

Oct. 5, 1976.

810

Jonathan Stein, David Kraut, James Gavin, and Robert Michael Kemler, Philadelphia, Pa., for plaintiffs.

Blank, Rome, Klaus & Comisky by Gilbert Stein, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

Plaintiffs in this action challenge certain policies and practices of the Philadelphia Gas Works (PGW) which, it is claimed, deprived plaintiffs and others similarly situated of their constitutional rights. Specifically, it is alleged that the defendants, individually and collectively, acting under color of state law, have violated, and continue to violate, the following constitutional rights of the plaintiffs: (1) their right to procedural due process, by terminating gas service without adequate notice and an opportunity for a prior evidentiary hearing; (2) their right to be secure in their persons and property, by unlawfully entering plaintiffs' homes for the purpose of shutting off gas service; and (3) their right to equal protection and due process, by enforcing security deposit policies which are arbitrary and capricious, and which discriminate against low-income gas consumers in the City of Philadelphia. In addition, plaintiffs assert various common law tort claims for invasion of privacy, and for intentional or reckless infliction of emotional and physical distress in connection with defendants' use of allegedly unfair and wrongful collection practices.

The Complaint asserts jurisdiction under the Civil Rights Act of 1871, 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1343(3), and general federal question jurisdiction under 28 U.S.C. § 1331; and plaintiffs have asked the Court to exercise pendent jurisdiction over their claims arising under the common law of Pennsylvania. The defendants, besides PGW,[1] are: The City of Philadelphia and the Philadelphia Gas Commission; the Philadelphia Facilities Management Corporation (a "private" non-profit corporation which manages PGW on behalf of the City); and the following individuals: the Mayor of Philadelphia, the members of the Philadelphia Gas Commission, and the Vice-President and members of the Board of Directors of the Philadelphia Facilities Management Corporation.[2]

---

1. PGW is not an identifiable corporeal entity or agency, but is merely the collective name for the real and personal property which is used to furnish gas service to more than half a million customers in the City of Philadelphia. Legal title to all of this property, including real estate, buildings, facilities and equipment, is in the name of the City of Philadelphia. (Affidavit of Edward F. Hubbard, General Manager of PGW, ¶¶ 4, 13). In practical terms, therefore, "PGW" is not the target of this action; but its "brand" name is stamped on all of the policies and practices challenged here.

2. The Vice-President of the Philadelphia Facilities Management Corporation is also the General Manager of PGW. The Complaint names him as a defendant in both capacities.

A hearing on plaintiffs' application for a temporary restraining order was held on November 16, 1973. Following that hearing, I entered an Order denying immediate injunctive relief. Thereafter, with the approval and encouragement of the Court, counsel for the parties worked out interim procedures for processing individual billing disputes between consumers and the utility, and agreed that this procedure would remain in effect pending final disposition of the lawsuit. Under this arrangement, in the case of a dispute as to the amount of, or liability for, a particular gas bill, PGW continues to supply gas service (or resumes service which was previously terminated for non-payment), pending adjustment or other disposition of the disputed claim through local legal procedures, provided the customer tenders a security deposit in an amount estimated to reflect current usage, and agrees to pay all future bills when due except in the case of obvious computer error.[3]

To date, this interim procedure has been invoked satisfactorily in more than 140 instances. I have no hesitation in stating that it has been my hope that experience gained from implementation of this interim procedure might lead to an amicable adjustment of all of the outstanding disputes between the parties. Unfortunately, however, neither side appears willing to accept this temporary arrangement as a basis for a permanent solution to the problem, and both sides insist upon a judicial resolution of all of the legal issues presented by various pending motions.

Plaintiffs have filed a motion for certification as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. Defendants oppose class treatment and have, in addition, filed motions to dismiss the action pursuant to Rule 12, on the following grounds: (1) failure to state a claim upon which relief can be granted; (2) lack of subject matter jurisdiction; (3) abstention; and (4) the bar allegedly repre-

sented by the Johnson Act, 28 U.S.C. § 1342. With respect to plaintiffs' "Second Claim," concerning alleged unlawful entries into customers' homes, the defendants have moved in the alternative for summary judgment. In addition, both sides have briefed the merits of plaintiffs' "First Claim," concerning the requirements of procedural due process in termination of gas service, and have submitted affidavits, exhibits, and other materials outside the pleadings in support of their respective positions on this issue. Accordingly, despite the failure of either side to move formally for summary judgment on the First Claim, I intend not only to rule upon defendants' Rule 12 motions to dismiss that claim, but also to dispose of the claim on the merits. *See* 6 Moore's *Federal Practice,* ¶ 56.12, at 56–334, 338–39; *Jennings v. Davis,* 476 F.2d 1271 (8th Cir. 1973). Before ruling on the merits, however, I will give the parties an opportunity to file formal motions for summary judgment, supported by such additional briefs, affidavits, or other materials as they deem appropriate, and to request a hearing thereon, if desired. My strong impression is that there are no genuine issues of material fact to be tried concerning the First Claim; if either side persuades me otherwise, the First Claim will be scheduled promptly for trial.

## I. *Plaintiffs' Class Action Motion*

Plaintiffs seek to maintain this action on behalf of three subclasses: The first includes all recipients of gas furnished by the defendants whose service has been terminated, or who are threatened with termination of service, for alleged non-payment of bills, without adequate notice and an opportunity for a pre-termination hearing. The second includes those persons who are unable to obtain gas service (or the restoration of previously terminated service) because of their financial inability to pay security deposits demanded by the defendants. The third, represented by the intervenor plaintiffs, includes those members of the first

---

**3.** Disputes over the amounts of future bills are to be resolved in post-payment refund claim procedures.

subclass who are not themselves direct customers of PGW but are tenants whose landlords are legally responsible for supplying gas, and whose service has been, or is in danger of being, terminated, without notice or a prior hearing, because of the landlord's alleged failure to pay PGW gas bills for those housing units.

The defendants have made several arguments in opposition to class certification as a whole, and have also raised a specific objection to the inclusion, as a subclass, of tenants who are not PGW customers. I will discuss these points in turn.

Relying upon *Ihrke v. Northern States Power Co.,* 459 F.2d 566 (8th Cir.) *vacated and dismissed as moot,* 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972), defendants argue that plaintiffs' claims are not typical of the claims of the class, and that plaintiffs will not fairly and adequately protect the interests of the class, because of the distinct possibility that many, perhaps most, of the members of the putative class are satisfied with the status quo. It is defendant's contention that most PGW customers would prefer not to run the risk of increases in gas rates which might become necessary to defray the additional expense of providing a pre-termination hearing procedure, as well as possible losses which might be incurred if the remedies sought by plaintiffs impaired the overall efficiency of PGW's collection efforts.

I find myself unable to agree with the reasoning of the Eight Circuit in *Ihrke.* As stated by Professor Moore, the issue of typicalness "is not a subjective test, authorizing a judge to dismiss a class action based on a substantial legal claim where he thinks some members of the class may prefer to leave the violation of their rights unremedied." 3B Moore's *Federal Practice* ¶ 23.06–2, at p. 23–327. *See Cottrell v. Virginia Elec. & Power Co.,* 62 F.R.D. 516 (E.D.Va.1974); *Koger v. Guarino,* 412 F.Supp. 1375 (E.D.Pa.1976) (Broderick, J.).

If there is a constitutional right to a pre-termination hearing, individual plaintiffs surely cannot be precluded from asserting such a right merely because a majority of their fellow customers might prefer not to have the right asserted. In determining whether the litigation asserting the existence of such a right may properly be maintained as a class action, the issue is merely whether the representative plaintiffs have demonstrated the probability of the existence of a sufficient number of persons similarly inclined and similarly situated to render the class action device the appropriate mechanism for obtaining a judicial determination of the rights alleged.

By defendants' own reckoning,[4] approximately 38,000 PGW customers each month are sent "shut-off" notices which threaten termination of gas service if their allegedly delinquent bills are not paid within six days of the date of the notice. Of these, most pay without further ado, but in the remaining cases—about 20,000 per year—gas service actually is terminated. Obviously, these cases are not uniform, but rather are shaded by individual circumstances; some customers claim to have paid the bill in question, while others contest the amount stated, or merely question a portion of the bill. Undoubtedly, too, there are those who simply deign not to pay an admittedly or obviously correct bill. Such distinctions among individual cases do not obviate the fact that the defendants' collection policies and practices operate uniformly against the entire class of persons whom plaintiffs seek to represent. Likewise, defendants' security deposit policies have a common impact on the proposed subclass of people who are unable to afford service. This is enough to support class certification under Rule 23(b)(2). *Koger v. Guarino,* 412 F.Supp. 1375, 1380 (E.D.Pa.1976).

Defendants also challenge the propriety of class treatment in view of the fact that plaintiffs are seeking compensatory damages in addition to injunctive and declarative relief. It is clear from a reading of the Complaint, however, that plaintiffs' prayer for damages is, at most, ancillary to the

---

4. Hubbard Affidavit, ¶¶ 14–15.

broad equitable relief sought on behalf of the class as a whole. At some point in the future, a determination of individual damage claims may become necessary, but at the moment, no such decision is at hand, and their presence in the Complaint does not justify denial of class treatment of the common issues for which equitable relief is sought.

Finally, with respect to the proposed subclass of tenants, defendants argue that such persons should be excluded from lawsuit because they are not, in fact, customers of PGW and do not pay (nor can they be forced by legal process to pay) PGW for the gas they consume. This is a curious argument, for on the face of the pleadings it is claimed that the defendants attempt to hold such tenants responsible for payment of utility bills by, among other things, threatening them with termination of service unless they pay all or part of their landlord's delinquent accounts, notwithstanding the fact that they have no contractual or legal obligation to do so. Certainly, tenants faced with this dilemma have an unassailable "interest" in contesting the defendants' termination and security deposit policies. Numerous decisions have recognized that persons whom a utility seeks to hold responsible for the allegedly unpaid bills of third parties have standing to challenge that practice on constitutional grounds. See, e. g., Craft v. Memphis Light, Gas & Water Div., 534 F.2d 684 (6th Cir. 1976) (denial of class treatment affirmed, but individual standing recognized); Davis v. Weir, 497 F.2d 139 (5th Cir. 1974) (class treatment affirmed for tenant subclass); Koger v. Guarino, 412 F.Supp. 1375 (E.D.Pa.1976) (tenant subclass certified). I will follow these precedents and certify the tenant subclass proposed here.

In summary, I will grant the motion for class certification and permit the named plaintiffs to proceed on behalf of the three subclasses described above. Motions to narrow, strike, subdivide, or otherwise modify these subclasses may, of course, be filed at any time pursuant to Rule 23(c)(4).

## II. *The Utility Defendants' Motions to Dismiss*

PGW and its managing agent, the Philadelphia Facilities Management Corporation (the "Utility Defendants") have moved to dismiss the Complaint for failure to state a claim and lack of subject matter jurisdiction. Specifically, they deny that they act "under color of state law," and assert that plaintiffs have no constitutionally protected "property interest" in gas service which would entitle them to seek relief under § 1983.

Discussion of these issues properly begins with consideration of the case of *Jackson v. Metropolitan Edison Co.*, 483 F.2d 754 (3d Cir. 1973), *aff'd*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Plaintiffs in *Jackson* asserted that they were deprived of property without due process of law by the actions of the defendant, a privately owned electric utility company regulated by the Pennsylvania Public Utility Commission, in terminating electricity service for non-payment of bills without prior notice, and without providing a pre-termination hearing or other advance opportunity for resolving disputes about the correctness of the billing. The Third Circuit upheld dismissal of the action on three grounds: (1) the defendant was not acting under color of state law; (2) plaintiffs' interest in continued electric service was not a sufficient property right to merit constitutional protection; and (3) requiring plaintiffs, as a condition of receiving continued electricity service, to pay disputed bills and then obtain whatever adjustments were merited did not violate due process. The Supreme Court affirmed, solely on the "state action" ground, and expressly refrained from considering the other two grounds relied upon by the Third Circuit (419 U.S. at 348, ftn. 3, 95 S.Ct. 449).

■ In the present case, it is clear that the requisite "state action" is present.[5] As

---

5. Action by an ostensibly private person "under color of state law" is the equivalent of "state action" although the two concepts spring from different constitutional and statutory sources. *U.S. v. Price*, 383 U.S. 787, 794, n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

noted earlier, all of the real and personal property subsumed under the name "PGW" is owned by the City of Philadelphia. The Philadelphia Gas Commission, which is an arm of City government by virtue of Article III, §§ 3–100 and 3–309 of the City Charter, was created for the purpose of overseeing the general operations of PGW. The defendant Philadelphia Facilities Management Corporation (PFMC) operates PGW under contract dated December 29, 1972, "for the sole and exclusive benefit" of the City, pursuant to Philadelphia Ordinance No. 455 of the same date. PFMC's status as a private, non-profit corporation cannot disguise or dispell the City's pervasive and significant participation as a joint venturer in PGW operations, including its collection and deposit policies, which admittedly are designed, above all else, to generate income for the City. *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Thus, the Supreme Court decision in *Jackson* furnishes no support for the defense motions in the present case. *Cf. Broderick v. Assoc. Hosp. Serv. of Phila.,* 536 F.2d 1 (3d Cir. 1976).

■ At issue, then, is the continuing vitality of the other two grounds relied upon by the Third Circuit in *Jackson,* namely that a utility customer's interest in continued service is not "property" entitled to constitutional protection and that, even if it were, post-payment/post-termination procedures for adjustment of billing disputes satisfy the requirements of due process. These alternative holdings, though not addressed by the Supreme Court, would seem clearly to be still binding upon this Court as constituting the law of this Circuit, unless the facts of the present case distinguish it from *Jackson,* or unless the opinions of the Supreme Court can be understood to express a contrary view.

On the latter point, it is clear that the three dissenting Justices in *Jackson* were of the view that termination of electric service

amounted to a sufficient interference with "property" to trigger application of the due process clause; and it is clear that Justice Marshall, at least, was satisfied that most of the majority shared that view, and would have reversed the Third Circuit on that point if they had decided that issue. There is perhaps room, also, for the argument that if the majority had not been at least in doubt as to the correctness of the Court of Appeals decision on the "property" issue, the majority would have included it as an alternative or supplemental ground for its holding.

But I do not believe it is appropriate for a district court to depart from the law established for this Circuit on the basis of such slender and ambiguous evidence of what the Supreme Court's views might have been on the alternative grounds for decision in *Jackson.* The Court elected to express no opinion on those issues at that time, and none should be inferred from its silence.

The question then becomes whether *Jackson,* on its facts, controls the present case. Plaintiffs contend that it does not and argue, moreover, that decisions of the Supreme Court since *Jackson* have eroded its vitality with respect to issues other than "state action."

The striking factual distinction between *Jackson* and the present case is, of course, that the Utility Defendants here have acted "under color of state law." This dilutes, to some extent, the force of the *Jackson* analysis of the "property" issue as applied to the instant case, for both factors were clearly intertwined in that decision, 483 F.2d at 759. On balance, however, on the question of whether there is a constitutionally protected right to utility service, I believe that the present case cannot reasonably be distinguished. Unlike water—which the Third Circuit conceded in *Jackson* to be indispensable to life and safety, 483 F.2d at 760— gas, as a general rule, is simply no more or less fundamental a service than electricity [6]

---

**6.** As I hypothesized at the TRO hearing, Tr. at p. 133, *Jackson* conceivably might be distinguished on the ground that it was concerned with utility equipment—the medium of heat

delivery—while the present case involves the source of heat itself. Thus, an electric furnace might be replaced, temporarily, with hand-operated equipment, but gas customers have no

—which the *Jackson* court unequivocally declined to hold "essential."[7] Thus, I cannot follow the route of *Koger v. Guarino,* 412 F.Supp. 1375 (E.D.Pa.1976), and hold the utility service here to be beyond the compass of *Jackson.*

I am persuaded, however, that the Supreme Court's recent decision in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), effectively overturns the Third Circuit's statement in *Jackson* that there is no constitutionally protected right to continued utility service once that service has been furnished—even if, as *Jackson* also ruled, there is no constitutional right to utility service in the first instance.

In *Goss,* the Supreme Court synthesized a line of earlier due process "entitlement" cases,[8] and analyzed in depth the constitutional ramifications flowing from a state or local government's decision voluntarily to furnish a service or benefit which it is not constitutionally obligated to provide. The plaintiffs in *Goss* were Ohio schoolchildren. They challenged the constitutionality of a local school board's practice of suspending students from school for 10 days or less without prior procedural safeguards. The defendants argued that "because there [was] no constitutional right to an education at public expense," 419 U.S. at 572, 95 S.Ct. at 735, plaintiffs' education was not constitutionally protected and could be interrupted for disciplinary reasons without regard to the due process clause. The Supreme Court rejected this argument, and held that although the state was not consti-

tutionally required to establish and maintain a public school system, its schoolchildren had a protected property interest in their education where, as in Ohio, state law extended that right by directing local authorities to provide free public education. *Id.* at 573, 95 S.Ct. 729. Justice White, speaking for the Court, explained:

> . . . Having chosen to extend the right to an education to people of appellees' class generally, Ohio may not withdraw that right on grounds of misconduct, absent fundamentally fair procedures to determine whether the misconduct has occurred . . .
>
> Although Ohio may not be constitutionally obligated to establish and maintain a public school system, it has nevertheless done so and has required its children to attend . . . The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that clause. *Id.* at 574, 95 S.Ct. at 736 (citations omitted).

■ This "property interest" analysis, which applies equally to the present case, cannot, I believe, be reconciled with the approach taken on this issue by the Third

---

alternative source of heat to rely upon in an emergency. This approach, however, would strip *Jackson's* property interest analysis to its narrowest possible application and would contravene the spirit, if not the letter, of that decision.

7. Because the court's discussion of the property issue in *Jackson* was, strictly speaking, *dictum* (the district court which decided the case below had addressed only the issue of state action, although the property issue was briefed on appeal), it may be that the Third Circuit did not have sufficient material before it to appreciate fully the potentially devastating impact of utility shut-offs on the lives of consumers. During recent winters, a number of deaths and

injuries have been reported in several states, including Pennsylvania, which apparently resulted from exposure to freezing temperatures after utility companies terminated heating services for alleged non-payment of bills. *See, e. g., The Philadelphia Inquirer,* Jan. 23, 1976, at p. 1–C, and Jan. 28, 1976, at p. 1–A; *The Boston Globe,* Feb. 9, 1974, at p. 17; *The New York Times,* Jan. 6, 1975, at p. 1, and Dec. 27, 1973, at p. 14.

8. *See, e.g., Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Circuit in *Jackson*.[9] To the extent that there is a conflict, the Supreme Court's expressed view must, of course, prevail. I conclude, therefore, that although the Utility Defendants have no constitutional obligation to furnish gas service to citizens of Philadelphia, their voluntary decision to do so means that such service, once extended, may not be terminated on the ground of non-payment except through fundamentally fair procedures to determine whether, in fact, the disputed bill is correct and has not been paid.

Here, too, as in *Goss*, there is a specific statutory basis for plaintiffs' claim of entitlement to continued service. Pennsylvania law mandates that "[e]very public utility shall furnish and maintain adequate, efficient, safe and reasonable service and facilities . . . Such service also shall be reasonably continuous and without unreasonable interruption or delay." 66 P.S. § 1171. This statute gives plaintiffs and their class a "legitimate claim of entitlement" to uninterrupted gas service, and this property interest cannot be interfered with except in a manner consistent with the requirements of the due process clause. 419 U.S. at 573, 95 S.Ct. 729.

*Goss* also lays to rest the argument, pressed by defendants here, that only "fundamental" interests in liberty or property are entitled to pre-deprivation procedural safeguards. The defendants contend that plaintiffs are adequately protected by post-payment refund procedures and are merely required to suffer temporary and *de minim-*is deprivation by having to pay a disputed bill in order to forestall termination of service. This is plainly wrong.

To require low-income customers either to pay (on short notice) a sum of money representing a good portion of their entire monthly income or to face termination of their gas service is a grievous interference with their constitutionally protected property interest in continuous service, and can by no stretch of the imagination be characterized as "*de minimis.*" *Goss v. Lopez, supra*, 419 U.S. at 575–76, 95 S.Ct. 729. It must be assumed, therefore, that some form of pre-deprivation procedural safeguards are required. At bottom, then, defendants' argument goes to the merits of plaintiffs' due process claim and has no place in the context of a motion to dismiss for failure to state a claim. The question is not *what* due process requires, but simply whether due process *is* required. I have ruled that it is. The Complaint states a claim for relief under § 1983, there is subject matter jurisdiction under 28 U.S.C. § 1343(3), and the Utility Defendants' motions to dismiss will be denied.[10]

### III. The Municipal Defendants' Motions to Dismiss

The City of Philadelphia (the City) and the Philadelphia Gas Commission (PGC) (collectively, the "Municipal Defendants") have moved to dismiss the Complaint for lack of jurisdiction and failure to state a claim. Their motions will be granted on the first of these grounds.

---

9. Since 1973, when the Third Circuit handed down its decision in *Jackson*, its position on the "property interest" issue has remained a minority view. The great majority of courts which have considered this question have agreed that consumers of a utility service possess a constitutionally protected interest in a continuation of that service and may not be deprived of it without due process of law. *Craft v. Memphis Light, Gas & Water Div.*, 534 F.2d 684 (6th Cir. 1976); *Palmer v. Columbia Gas of Ohio, Inc.*, 479 F.2d 153 (6th Cir. 1973); *Condosta v. Vermont Elec. Cooperative, Inc.*, 400 F.Supp. 358 (D.Vt.1974); *Donnelly v. City of Eureka*, 399 F.Supp. 64 (D.Kan.1974); *Bronson v. Consolidated Edison of N.Y., Inc.*, 350 F.Supp. 443 (S.D.N.Y.1972); *Hattell v. Public*

*Serv. Co. of Colorado*, 350 F.Supp. 240 (D.Colo. 1972); *Stanford v. Gas Service Co.*, 346 F.Supp. 717 (D.Kan.1972); *Davis v. Weir*, 328 F.Supp. 317 (N.D.Ga.1971); *Lamb v. Hamblin*, 57 F.R.D. 58 (D.Minn.1972). *See also Koger v. Guarino*, 412 F.Supp. 1375 (E.D.Pa.1976), in which my colleague Judge Broderick recently held *Goss* dispositive over *Jackson* on the "property interest" issue.

10. It is therefore unnecessary to consider whether the Complaint also states a claim against the Utility Defendants under 28 U.S.C. § 1331. That issue is discussed, below, in connection with the Municipal Defendants' motions.

■ Plaintiffs concede that the City is not a "person" within the meaning of 42 U.S.C. § 1983 and therefore is not amenable to suit, either for damages or equitable relief, under that statute. *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Neither is PGC, which is an arm of City government pursuant to Article III, §§ 3–100(f), 3–309 of the Philadelphia Home Rule Charter. *Jorden v. Metropolitan Utilities District,* 498 F.2d 514 (8th Cir. 1974); *Edwards v. Philadelphia Elec. Co.,* 371 F.Supp. 1313, 1316–17 (E.D.Pa.1974), *aff'd without opinion,* 510 F.2d 969 (3d Cir. 1975); *U.S. ex rel. Gittlemacker v. County of Philadelphia,* 413 F.2d 84, 86 (3d Cir. 1969), *cert. denied*

396 U.S. 1046, 90 S.Ct. 696, 24 L.Ed.2d 691 (1970).

■ The issue, then, is whether there is an alternate basis for the exercise of federal subject matter jurisdiction over the Complaint as against the Municipal Defendants. Plaintiffs propose federal question jurisdiction, 28 U.S.C. § 1331(a). The Municipal Defendants dispute this, contending, among other things, that the "matter in controversy" here does not surpass the jurisdictional sum of $10,000.[11] I have reviewed the Complaint and the motion papers on this point. With all due deference to the plaintiffs' proposed valuation of the claims asserted in this case,[12] I nevertheless have concluded, for the reasons stated below, that the Municipal Defendants' position is correct, and that there is no jurisdiction here under § 1331(a).[13]

**11.** The original Motions to Dismiss filed on behalf of the Municipal Defendants did not address the issue of § 1331(a) jurisdiction, but they incorporated by reference the arguments made in the Motion filed on behalf of certain other defendants (PGW, PFMC, and individuals connected with them), in which the jurisdictional amount in controversy specifically was challenged. In a subsequent reply memorandum, the Municipal Defendants themselves reiterated the argument that the value of the claims asserted in this lawsuit did not meet the test of § 1331(a).

**12.** Ordinarily, the amount in controversy proposed by the plaintiff is accepted for purposes of § 1331(a), if (as here) made in apparent good faith, unless the Court is convinced "to a legal certainty" that the claim actually is for less than the jurisdictional amount. *St. Paul Mercury Indemn. Co. v. Red Cab Co.,* 303 U.S. 282, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Moreover, since I have limited class certification, at least for the present, to plaintiffs' claims for equitable relief, the rule applies that the value of the "matter of controversy" should be computed by looking to the value of the right sought to be protected. Considering that the rights at issue here are fundamental constitutional guarantees, I would be hard-pressed to find "to a legal certainty" that plaintiffs' claims fall below the jurisdictional amount. *See, e.g., Spock v. David,* 469 F.2d 1047, 1052 (3d Cir. 1972), *rev'd on other grounds,* 421 U.S. 908, 95 S.Ct. 1556, 43 L.Ed.2d 773 (1976); *Revis v. Laird,* 391 F.Supp. 1133, 1139 (E.D.Cal.1975). *But see Randall v. Goldmark,* 495 F.2d 356, 360 (1st Cir. 1974) (per curiam) (expressing "the 'gravest doubts" whether plaintiff's claim of denial of due process in the reduction of her welfare shelter allowance involved a requisite amount in controversy under § 1331(a)).

All of this presupposes, however, that the plaintiffs' assertion of a requisite amount in controversy has not been challenged by the defendants. Where, as here, the value of the claims has been placed in issue by the defendants, different rules of adjudication apply. See the discussion that follows in the text, *infra.*

**13.** In all other respects I find that the elements of federal question jurisdiction are present. First, under the current state of the law, it is settled that actions asserting the denial of constitutional rights present "federal questions" cognizable under § 1331(a). *U.S. ex rel. Moore v. Koelzer,* 457 F.2d 892 (3d Cir. 1972). The many decisions on point are marshalled in *Greenya v. George Washington Univ.,* 167 U.S. App.D.C. 379, 512 F.2d 556, 562 n. 13, *cert. denied,* 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975), and *Panzarella v. Boyle,* 406 F.Supp. 787, 792 n. 7 (D.R.I.1975).* Federal question jurisdiction is available notwithstanding the fact that the defendant is a municipality which could not be sued in a parallel action under § 1983. *Gray v. Union County Intermediate Educ. Dist.,* 520 F.2d 803, 805 (9th Cir. 1975); *Maybanks v. Ingraham,* 378 F.Supp. 913 (E.D.Pa.1974). (*But see Aldinger v. Howard,* —— U.S. ——, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), which arguably casts doubt on the future of § 1331 jurisdiction over civil rights actions against municipalities.) Second, there is no question but that the Municipal Defendants' challenged conduct with respect to PGW's collection and security deposit policies constitutes "state action." *See* page 814, n. 5, *supra.*

* *But see Pitrone v. Mercadante,* C.A. No. 75–2455 (E.D.Pa. Sept. 30, 1976) (Ditter, J.) (holding that there is no implied cause of action against a municipality arising out of the

The rule enunciated by the Supreme Court in *Hague v. CIO,* 307 U.S. 496, 507–08, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), and recently cited approvingly in *City of Kenosha v. Bruno,* 412 U.S. 507, 514, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), is that where a defendant disputes the value of the matter in controversy—even in a case seeking to redress the alleged denial of the most precious constitutional rights [14]—the plaintiff must present "substantial proof" in support of his position that the jurisdictional amount requirement indeed has been met. At bottom, of course, this is nothing more than a elaboration of the fundamental principle that the party asserting federal subject matter jurisdiction has the burden of proving it. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Jurisdiction under § 1331(a) cannot be assumed, although in the absence of a defense challenge, the plaintiff's good faith claim is usually accepted. As the Third Circuit recently admonished, it is "incumbent" upon the courts to make findings of "jurisdictional facts" in support of the exercise of federal question jurisdiction, given the "Congressional mandate" to restrict jurisdiction in this area. *Sedivy v. Richardson,* 485 F.2d 1115, 1117 (3d Cir. 1973), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 774 (1975). *But see Lynch v. Household Finance Corp.,* 405 U.S. 538, 550, 92 S.Ct. 1113, 31 L.Ed.2d 424

(1972) (suggesting that this policy of constricted jurisdiction is aimed primarily at the burgeoning diversity caseload under § 1332).

Plaintiffs' position is that even under the stiffer requirement of *Hague,* they have carried their burden of demonstrating that the "matter in controversy" here has a value in excess of $10,000 excluding interest and costs. In support of this position, however, they have adduced no new "proof" (much less "substantial proof") of the value of their claims, but rather have rested on the allegations contained in the Complaint and have sought to draw inferences therefrom to justify their conclusion that there is a requisite sum in controversy. My analysis of the pleadings does not support plaintiffs' position.

I note, first, that there is no specific allegation, either in the original Complaint or the Complaint in Intervention, that "the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs," 28 U.S.C. § 1331(a), although ¶ 2 of the Complaint asserts jurisdiction under that statute. This, of course, could be considered merely a technical defect in pleading, were it possible to conclude, from a reading of the entire Complaint, that the value of the claims asserted on behalf of each of the named plaintiffs surpassed the jurisdictional amount.[15] Put another way,

Fourteenth Amendment and cognizable under § 1331(a)).

14. This is an implied, but unmistakable, corollary to the Court's decision in *Hague,* for that was a First Amendment case. Several of the cases relied on by the plaintiffs, notably *Revis v. Laird,* 391 F.Supp. 1113, 1139 (E.D.Cal.1975), and *Bass v. Rockefeller,* 331 F.Supp. 945, 953 n. 6 (S.D.N.Y.1971), come close to suggesting that for all practical purposes there is no jurisdictional amount requirement for § 1331(a) cases alleging the denial of fundamental constitutional rights, but I believe this is at odds with the Supreme Court's pronouncements on the subject. *See Lynch v. Household Finance Corp.,* 405 U.S. 538, 547, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), as well as *Hague v. CIO, supra,* and *City of Kenosha v. Bruno, supra* (in which the Court remanded for development of an adequate record the plaintiff's assertion of § 1331(a) jurisdiction over his claim of denial of

procedural due process). The point is elaborated in *Network Project v. Corp. for Public Broadcasting,* 398 F.Supp. 1332, 1340–41 (D.D.C.1975) (rejecting plaintiffs' assertion that constitutional rights automatically should be valued at more than $10,000).

15. Aggregation of claims is not permitted, *Hague v. CIO, supra,* 307 U.S. at 508, 59 S.Ct. 954. The named plaintiffs in the present case represent broad subclasses of gas customers in the City, but each essentially is asserting a "separate and distinct" claim for denial of constitutional rights, notwithstanding the fact that all of the claims are said to arise from policies of the defendants which have a common impact. I construe the Supreme Court's decision in *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), to preclude aggregation in (b)(2) class action as well as those certified under Rule 23(b)(3). *Accord,*

if it appeared that the claim of any named plaintiff failed to exceed $10,000, plaintiffs' entire argument for § 1331(a) jurisdiction would fail. *Amen v. City of Dearborn*, 532 F.2d 554, 559 (6th Cir. 1976). So it is here.

Flora Bowman is one of the named plaintiffs in this case. She alleges that she was forced, as a condition for obtaining gas service, to agree to pay an exorbitant security deposit. The gist of her claim is that because she is on welfare, it is a great hardship for her to pay this deposit, even in installments, and that should she default, defendants might terminate her gas service. The actual sum of money involved in the Bowman case is, at most, $200 (the security deposit originally demanded of her, which later was reduced to $120 or $60 after negotiations between Mrs. Bowman's attorney and PGW personnel.) [16] Mrs. Bowman's gas service has not been shut off, nor is she immediately threatened with termination. Thus, she cannot claim, as other plaintiffs do, that the defendants' conduct has caused her to suffer severe physical hardship, illness, or other problems allegedly attendant on termination of service.[17] No additional evidence has been proffered by the plaintiffs in response to the Municipal Defendants' § 1331(a) challenge which might justify a finding that the claim of Flora Bowman exceeds in value the sum of $10,000. Accordingly, and for this reason alone, I would hold that plaintiffs have failed to carry their burden of persuasion on the issue of jurisdictional amount, at least with respect to the subclass of plaintiffs represented by Mrs. Bowman (*i. e.*, persons challenging the security deposit policies whose gas service has not actually been terminated). *Amen v. City of Dearborn, supra.* As

for the other named plaintiffs and their subclasses, the Complaint seeks "compensatory damages" for various named plaintiffs in amounts ranging from $25,000 to $100,-000, and "appropriate" monetary relief for other members of the plaintiff class. A comparison of these prayers for relief with specific allegations in the Complaint demonstrates that the plaintiffs' estimate of the value of their claims is not supported by specific allegations or evidence of injury.

Paragraphs 42 through 46, for example, describe the harm allegedly caused to the Dawes family as a result of termination of their gas service. By definition, of course, the family for a time was deprived of heat, hot running water, and cooking facilities; the Complaint also cites "severe hardships, deprivation and severe mental distress and suffering." The most specific allegations of injury are that Mrs. Dawes' younger daughter suffered "severe respiratory infections and illness" (aggravating, or aggravated by, a pre-existing heart murmur), that Mrs. Dawes herself on one occasion suffered a severe respiratory ailment, and that the entire family was forced to relocate in different housing "to escape the unbearable and intolerable situation" caused by termination of their gas service.

In other portions of the Complaint, the remaining named plaintiffs are alleged to have suffered colds, aggravation of pre-existing medical problems (hypertension, gout, allergies, back pain), and "severe mental distress" as a result of termination of gas service. None of these claims are substantiated with proof of medical bills or hospital visits, and, generally speaking, all are couched in conclusory language unsup-

---

*Amen v. City of Dearborn*, 532 F.2d 554, 559 (6th Cir. 1976).

**16.** Other named plaintiffs were required to pay as little as $24.98 (on account) or as much as $105 to forestall termination or obtain service. The allegedly unpaid bills involved in the termination cases range in amount from $125 (Dawes) to $300 (Poindexter). In terms of real dollars, therefore, none of the claims remotely approaches a value of $10,000. I recognize that for a person of low income, it may be equally impossible on short notice to produce

$100 or $100,000. But that cannot mean that plaintiff's claims should automatically be valued at the higher figure. Rather, the specific allegations of injury set forth in the Complaint must be examined to determine whether, on balance, they describe deprivation or hardship which can be fairly said to state a claim for more than $10,000 per person.

**17.** Whether the other named plaintiffs have met the jurisdictional amount on the basis of these additional allegations of harm caused by termination of service is discussed *infra*.

ported by "substantial proof" of monetary value. *See Randall v. Goldmark*, 495 F.2d 356, 360 (1st Cir. 1974) (per curiam).

Given these jurisdictional facts, plaintiffs' arguments in favor of § 1331(a) jurisdiction can succeed only if this Court is persuaded to (1) ignore the amount in controversy requirement of the statute; (2) fashion a *per se* rule to the effect that the constitutional rights sought to be protected here have, by definition, a value exceeding $10,000; or (3) apply the *Hague* rule, but with such great elasticity that broad, conclusory, and unsupported allegations of injury will qualify as "substantial proof" of monetary value beyond the jurisdictional minimum. None of these approaches is faithful to the spirit of § 1331(a) or to the commands of the higher courts on this subject. In short, I do not believe that plaintiffs have met their burden under *Hague*, and I find, therefore, that there is no jurisdiction under § 1331(a). The Complaint will be dismissed as against the Municipal Defendants. Moreover, as required by the Supreme Court's recent decision in *Aldinger v. Howard*, ── U.S. ──, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), plaintiffs' state claims against the Municipal Defendants also will be dismissed for lack of jurisdiction.[18]

### IV. *Individual Defendants' Motions to Dismiss*

As presently constituted, this lawsuit seeks classwide equitable relief and individual awards of compensatory damages against a number of individuals who hold official positions with the Utility and Municipal Defendants, to wit: the Mayor of Philadelphia, the members of PGC, and the Vice-President and members of the Board of Directors of PFMC. These Individual Defendants have filed motions to dismiss the Complaint for failure to state a claim. Although less stringent pleading require-

ments are imposed on § 1983 suits for equitable, as opposed to monetary, relief,[19] I think that the present Complaint fails to state a claim for either category of relief against the Individual Defendants, and the motions to dismiss therefore will be granted.

The Individual Defendants are named in the caption of the Complaint, and their respective official capacities and areas of responsibility are set forth in ¶ 11 of that document. Beyond that, however, no Individual Defendant is mentioned even a single time in the body of the Complaint. Plaintiffs have made no attempt to allege that any Individual Defendant personally directed, acquiesced or participated in, or even had knowledge of, the collection, termination and security deposit policies and practices which are challenged here on constitutional grounds. As against these defendants, there simply is no claim stated.

In the Third Circuit, well-settled rules govern pleading requirements in civil rights actions. Several are pertinent here. First, where it is claimed that a named individual actually participated in unconstitutional conduct under color of state law, the Complaint must specifically allege that personal involvement and state (consistent with liberal standards of notice pleading) in what manner the defendant deprived the plaintiff of his civil rights. *Curtis v. Everette*, 489 F.2d 516 (3d Cir. 1973). Second, where an individual is not charged with having participated directly in the complained-of conduct but rather is alleged to be liable for that conduct by virtue of his position as supervisor of those directly responsible, the Complaint nevertheless must aver "personal involvement" on the part of the supervisor, at least to the extent that he knew of, and acquiesced in, the unconstitutional conduct of his subordinates. *U. S. ex rel. Bennett v. Prasse*, 408

---

**18.** Those gas customers who, because of termination of gas service or other conduct of the defendants, have suffered concrete injury on the magnitude contemplated by § 1331(a) have, I am sure, ample incentive to pursue such claims in the state courts. Be that as it may, there is not sufficient basis, on the facts of the

present case, to sustain § 1331(a) jurisdiction over the federal claims asserted here against the Municipal Defendants.

**19.** *Downs v. Dept. of Public Welfare*, 368 F.Supp. 454, 464 (E.D.Pa.1973) (citing cases).

F.Supp. 988, 991 (E.D.Pa.1976) (citing cases). Although the rule is more often stated in cases seeking damages against supervisory personnel,[20] it also applies to suits for equitable relief. *See Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

Implicit in what I have just said is that the common law tort doctrine of *respondeat superior* is not available to the plaintiffs in the present case and that, for this reason, they may not rely simply on allegations of the Individual Defendants' official supervisory capacities to hold such persons liable under § 1983 for the challenged policies and practices of the Utility Defendants or its employees. This point requires amplification.

The Mayor of Philadelphia and the members of the PGC are, strictly speaking, employees of the City and are not the "employers" of any agency or individual (whether named in the Complaint or not) who, it is claimed, has deprived plaintiffs of constitutional rights in violation of § 1983. Thus, they are not proper targets for a claim of vicarious liability even if that theory were recognized in § 1983 cases. The true "employer" is the City, and it is not amenable to suit under that statute, vicariously or otherwise.[21] *Jennings v. Davis,* 476 F.2d 1271, 1274–75 (8th Cir. 1973); *Downs v. Dept. of Public Welfare,* 368 F.Supp. 454, 463–64 (E.D.Pa.1973). *Cf. Hill v. Toll,* 320 F.Supp. 185, 189 (E.D.Pa.1970) (distinguish-

ing between a municipal employer and a truly "private" one).

The status of the remaining Individual Defendants as potential targets for vicarious liability under § 1983 poses similar problems. Again, a threshold issue is whether these people are themselves "employees" of the Utility Defendants and, as such, not proper subjects for imposition of vicarious liability as a matter of the basic common law of torts, wholly apart from the special policy considerations which attend § 1983. *See Jennings v. Davis, supra.*[22] Even if these Individual Defendants were deemed to be "employers" there is a serious question whether § 1983 can be a vehicle for the imposition of vicarious liability upon them for the conduct of their subordinates. *Compare Hill v. Toll,* 320 F.Supp. 185 (E.D. Pa.1970) (§ 1983 incorporates doctrine of *respondeat superior* where employer is private party), *with Draeger v. Grand Central, Inc.,* 504 F.2d 142, 146 (10th Cir. 1974) (no vicarious liability under § 1983 even for purely private employer) *and Weiss v. J. C. Penney Co.,* 414 F.Supp. 52 (N.D.Ill.1976) (following *Draeger*). All three cases involved actions for damages under § 1983. I am not aware of any decision which expressly holds that there can be no vicarious liability against a private employer in suits for equitable relief under § 1983.

Even affording plaintiffs the widest latitude, and assuming that the doctrine of *respondeat superior* would, in theory, be available in an appropriate case to impose

---

**20.** *See, e. g., Bracey v. Grenoble,* 494 F.2d 566 (3d Cir. 1974); *Curtis v. Everette, supra; Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973); *U. S. ex rel. Bennett v. Prasse, supra.*

**21.** Whether a municipality, *qua* employer of persons who are found to have violated a plaintiff's constitutional rights, might be vicariously liable for damages under § 1331(a) is a fascinating question which is discussed at length in Note, *Damage Remedies Against Municipalities for Constitutional Violations,* 89 Harv.L.Rev. 922. In view of my previous ruling that plaintiffs have not satisfied the amount in controversy requirement of the federal question statute, the issue does not arise in this case. For one court's view, *see Jamison v. McCurrie,* 388

F.Supp. 990, 993–94 (N.D.Ill.1975) (even if such relief were constitutional under § 1331(a) it should be withheld on grounds of public policy in view of parallel, adequate state remedies).

**22.** At least with respect to Individual Defendant Edward F. Hubbard, who is Vice-President of PFMC and General Manager (presumably the highest executive officer) of PGW, I am inclined to the view that we are dealing here with an "employee" of the Utility Defendants, just as the mayor of a city is an "employee" of that city. *Jennings v. Davis, supra.* I express no opinion on the "employer-employee" status of the members of PFMC's Board of Directors, except to emphasize once again the analytical problems involved in any attempt to posit vicarious liability under the Civil Rights Act.

liability upon the Vice-President and Board of Directors of PFMC, the Complaint fails to allege that the complained-of conduct was undertaken by employees of the Individual Defendants acting within the scope of their employment. No "employees" of PGW or PFMC are named in the Complaint as, for example, having unlawfully entered customers' homes without consent to shut off gas service. There is simply no basis here for vicarious liability even if such a theory were, as Chief Judge Lord held in *Hill v. Toll, supra,* available under § 1983 against private employers.

The Complaint will be dismissed as against all Individual Defendants, but I will give plaintiffs an opportunity to replead in this respect. I caution them, however, to consider the rule in this Circuit requiring allegations of "personal involvement" on the part of supervisory personnel. In connection with plaintiffs' hopes for individual damage awards they should be mindful, too, of the numerous decisions which have established a good faith defense to civil rights damage claims for individuals who, acting on behalf of public agencies, have reasonably relied on the validity and constitutionality of agency policies and procedures. Even if such policies subsequently are ruled unconstitutional, the individuals who implemented them in good faith cannot be forced to answer in damages for doing so. *See Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Hanna v. Drobnick,* 514 F.2d 393 (6th Cir. 1975); *Clark v. Zimmerman,* 394 F.Supp. 1166, 1176 (M.D.Pa.1975); *Bauer v. Sielaff,* 372 F.Supp. 1104 (E.D.Pa.1974); *U. S. ex rel. Bracey v. Rundle,* 368 F.Supp. 1186 (E.D.Pa. 1974) (Lord, C. J.).

With these caveats, I will dismiss plaintiffs' claims as against the Individual Defendants, without prejudice, and afford plaintiffs an opportunity to replead.

### V. *All Defendants' Motions to Dismiss and for Summary Judgment on Plaintiffs' "Second Claim"*

Plaintiffs' second claim for relief charges all defendants with having deprived class members of their constitutional rights by "breaking and entering upon [plaintiffs'] property without benefit of a search warrant or court order, and without  .  .  . consent" for the purpose of disconnecting gas service. Although the operative paragraphs of the Complaint also mention the First and Ninth Amendments to the Constitution, it is obvious to me that the claim which plaintiffs have attempted to state here arises under the Fourth Amendment, as rendered binding on the States through the due process clause of the Fourteenth. For the balance of this discussion then, and indeed for the balance of the lawsuit, I will disregard plaintiffs' characterization of this grievance as anything but a Fourth Amendment claim.

In the entire body of the original Complaint there is only one factual allegation in support of this claim for relief. It appears in ¶ 38, which reads in pertinent part:

> On or about July 11, 1973, at about 9:00 a. m., when no one was at home, employees of defendants knowingly and forcibly, without warning, and without any permission, consent, search warrant, or court order, breached the basement of 1711 Dickinson Street where the Dawes family was residing, and disconnected their gas service.

A substantially similar allegation appears in ¶ 5 of the Provotero Complaint in Intervention (on behalf of the tenant subclass).

There is nothing in the pleadings, other than these two paragraphs, to suggest that any of the defendants have engaged in a classwide pattern of unlawful intrusions into customers' homes. No PGW employee (collection agent, claims representative, or the like) is identified by name as having effected unlawful entries into plaintiffs' homes as part of PGW "collection" procedures, and no such person is a defendant as yet. Indeed, there is no allegation, to speak of, that a classwide pattern of such unlawful entries exists. Finally, there is no claim, as there must be to resist a motion to dismiss, that the Utility Defendants, through their officers or directors, were personally involved in formulating, promul-

gating, implementing, or enforcing any such policy of unconstitutional intrusions, or that they knew of and countenanced it.

■ Under these circumstances the "Second Claim" must be dismissed for failure to state a claim upon which relief can be granted. I have no doubt that the intrusions complained of, if proved, would constitute a denial of the Fourth Amendment rights. *See Camara v. Municipal Court*, 378 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Hanna v. Drobnick*, 514 F.2d 393 (6th Cir. 1975); *Laprease v. Raymours Furniture Co.*, 315 F.Supp. 716, 721–22 (N.D.N.Y.1970). The present allegations, however, are altogether too vague and fail to assert the requisite involvement on the part of the named defendants. I note, too, that plaintiffs' failure to identify which PGW employees allegedly carried out these intrusions might, if not cured on repleading, affect the availability of appropriate equitable relief on the merits. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

The Motions to Dismiss the "Second Claim" will be granted, without prejudice, and plaintiffs may replead. My earlier comments on the subject of *respondeat superior* under § 1983 are equally applicable here.. The defense motions for summary judgment will be denied, without prejudice, in view of my decision to grant the motions to dismiss. I would have denied the motions for summary judgment on the present record, however, had they not been mooted.[23]

■ To the extent that plaintiffs' "Second Claim" also purports to state a claim for relief under Pennsylvania law, alleging invasion of privacy, *see Bennett v. Norban*, 396 Pa. 94, 151 A.2d 476 (1959) it of course is not dismissed. Defendants' only challenge to this and other state claims asserted by plaintiffs is based on the argument that there is no pendent jurisdiction over such claims. Whether, under Pennsylvania law, this and plaintiffs' other "pendent" causes of action state claims for relief is not before me at this time. As for defendants' motions to dismiss for lack of pendent jurisdiction, see Part VIII of this Memorandum at pp. 825–826.

## VI. All Defendants' Motions to Dismiss Plaintiffs' "Third Claim"

Plaintiffs' third claim for relief alleges that the

. . . [d]efendants have tortiously caused plaintiffs to suffer severe emotional and mental distress and illness in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and Pennsylvania Common Law by the use of threats to discontinue service and abusive and harassing demands for payment of past bills with negligent, reckless, wanton and willful disregard for the effects of termination on the life and health of consumers and [for] the existence of billing disputes.

■ On its face, this is simply a common law tort claim, and merely to insert the phrase "in violation of . . . § 1983" does not (and cannot) convert it into a cause of action for denial of constitu-

---

**23.** Summary judgment at this stage would have been inappropriate for several reasons. First, as to the Dawes episode, there was sharply conflicting evidence received at the hearing on plaintiffs' motion for a temporary restraining order. One James Shelton, a PGW employee, admitted that he entered the Dawes home on the above date and shut off gas service to the house. He insisted, however, that· his entry was by permission, saying a teenage boy who appeared to reside there had given him the house key. This version of the incident conflicted with that given by Mrs. Dawes, who disclaimed any knowledge of the teenager and contended that no one was authorized to permit PGW employees access to her home.

Plaintiffs also submitted an affidavit from one Carolyn King, a neighbor, who gave an eyewitness account supporting Mrs. Dawes' account. This factual dispute alone would have been enough to preclude summary judgment. Second, the defendants specifically relied on Mr. Shelton's testimony as essentially the sole basis for their motions for summary judgment. But he, as a PGW employee with some real interest in the matter, is a witness whom a jury would have the right to disbelieve, and summary judgment cannot be awarded solely on the basis of such testimony. *U. S. v. Logan Co.*, 147 F.Supp. 330, 333 (W.D.Pa.1957). In any event, the record is not adequate for the purpose of deciding this claim on the merits.

tional rights. *Howell v. Cataldi*, 464 F.2d 272, 277–79 (3d Cir. 1972).[24] Plaintiffs apparently recognize the tenuous federal character of this claim, for they have made no attempt to specify in what way defendants' "tortious" collection practices violate the civil rights statute, or of which constitutionally protected rights these practices deprive them.

The plaintiffs' "Third Claim" therefore will be dismissed, with prejudice, insofar as it purports to state a claim for relief under § 1983. As noted earlier, defendants have not challenged the vitality of this claim under the law of Pennsylvania but have moved to dismiss solely on the ground that this Court lacks pendent jurisdiction to hear it. That issue is discussed below.

### VII. All Defendants' Motions to Dismiss Plaintiffs' "Fourth Claim"

■ The final claim for relief which appears in the original Complaint focuses on "[d]efendants' security deposit policies and practices," which, it is alleged discriminate arbitrarily and invidiously against members of the plaintiff class, are not reasonably related to their intended purpose of reducing PGW's bad debt losses, and therefore violate plaintiffs' rights to due process and equal protection of the laws guaranteed by the Fourteenth Amendment. The gist of the claim is that PGW demands payment of security deposits which are so exhorbitant, relative to plaintiffs' very low (and fixed) incomes, that plaintiffs simply cannot afford to obtain gas service. In view of my earlier discussion of the "property interest" asserted here, it should be stated for the record that plaintiffs can claim no "fundamental" constitutional right to gas service in the first instance; on this issue, in my judgment, the Third Circuit's decision in *Jackson* retains vitality in this Circuit and

must be read to foreclose such a claim. *Cf. Donnelly v. City of Eureka, Kansas*, 399 F.Supp. 64, 67 (D.Kan.1975). However, given the Utility Defendants' decision to furnish gas service to citizens of the City, there is a constitutionally protected expectation, shared by all potential customers, that this service will be made available in a reasonably fair manner, unhampered by arbitrary, capricious, or discriminatory policies which, without any justifiable basis, would operate to exclude certain classes of potential customers from obtaining it.

■ That, essentially, is the interests which plaintiffs have asserted in their "Fourth Claim," and of which, they say, the defendants have deprived them. I find, therefore, that this cause of action states a claim upon which relief can be granted under § 1983. *See Craft v. Memphis Light, Gas & Water Div.*, 534 F.2d 684 (6th Cir. 1976); *Davis v. Weir*, 497 F.2d 139 (5th Cir. 1974); *Koger v. Guarino*, 412 F.Supp. 1375, 1390–92 (E.D.Pa.1976). The defendants' motions to dismiss this claim will be denied.

### VIII. Defendants' Motions to Dismiss Plaintiffs' State Law Claims for Lack of Pendent Jurisdiction

Plaintiffs' state law claims appear in the second and third claims for relief in the original Complaint and are discussed in Parts V and VI of this Memorandum, respectively. Essentially, they seek relief under the common law of Pennsylvania for invasion of privacy (wrongful intrusions into customers' homes for the purpose of terminating gas service) and intentional or reckless infliction of physical and emotional distress (dunning, harassment, and other outrageous collection techniques). The defendants have filed motions to dismiss both state claims for lack of pendent jurisdiction.

---

24. In a civil rights action to redress alleged violations of § 1983 where the complained-of conduct also "sounds in tort," it is important to recognize that the federal court hearing the matter is "not dealing with a tort *qua* tort, but with an [alleged] invasion of a constitutional protection," *Howell v. Cataldi, supra*, at 279. Thus, if a plaintiff charges a defendant with

nothing more than common law tortious conduct, the absence of a definable constitutional dimension renders the claim not cognizable under § 1983. Conversely, the Civil Rights Act protects against some forms of oppression or misconduct which might not be protected by state tort law. *Id.* at 278.

The motions will be granted in part and denied in part.

■ First, as noted earlier, there is no federal subject matter jurisdiction over plaintiffs' state claims against the Municipal Defendants. That a state court, applying state law, might hold either or both of the Municipal Defendants liable for the actions complained of in the present case [25] is immaterial; there is no "pendent party" jurisdiction in this forum to hear such claims. *Aldinger v. Howard*, —— U.S. ——, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). They will be dismissed, together with plaintiffs' federal claims against the Municipal Defendants.

■ As against the remaining defendants (including the Individual Defendants in the event they are reinstated as parties defendant through an amended pleading), plaintiffs' state law claims may be resolved in this forum if they are so related to the federal claims that all of the causes of action can be said to derive from a common nucleus of operative fact and would ordinarily be expected to be tried, together, in a single judicial proceeding. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). I believe that the *Gibbs* test is met in this case and that I have the jurisdictional power to adjudicate plaintiffs' state claims. For the following reasons, however, I have decided not to exercise that power.

■ Plaintiffs' state claim for invasion of privacy parallels their "Second Claim" for relief under § 1983—which has been dismissed from the case with leave to replead. Whether pendent jurisdiction should be exercised will depend upon whether plaintiffs attempt to amend; I need not resolve that issue now.

■ Plaintiffs' other state claim has no present or potential federal counterpart in the lawsuit, because I have dismissed with prejudice the "Third Claim" for relief under § 1983. Despite its common factual link

with the federal claims which have remained in the case, this state claim cannot be adjudicated, in my judgment, without a detailed collateral inquiry into the collection techniques allegedly used by PGW employees against numerous individual members of the plaintiff class, which would divert attention from the main issues in the case. I therefore decline to exercise pendent jurisdiction over the state claim for infliction of emotional and physical distress.

## IX. Abstention and the Johnson Act

■ The defendants urge abstention on the ground that the relief sought in this case ultimately will affect an area regulated almost exclusively by state agencies. They rely on *Alabama Public Services Comm'n v. Southern Ry.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). That case stands for the proposition that federal courts should hesitate before interfering in the operation of public utilities. It does not say, however, that federal courts necessarily must decline to hear all suits against public utilities, especially where the federal court's intervention would not bypass the state's regulatory system or directly affect the continuance of the service. I know of no case in which a federal court, faced with similar challenges to the constitutionality of utility termination policies, has declined to adjudicate the claims on the ground of abstention. One court which addressed this issue directly on appeal concluded that while "the exercise of the abstention doctrine is purely discretionary . . . we do not find that it was an abuse of the [District] Court's discretion to refuse to abstain from taking jurisdiction of this important civil rights case . . . ." *Palmer v. Columbia Gas of Ohio, Inc.*, 479 F.2d 153, 170 (6th Cir. 1973). I see no reason to abstain in this case and decline to do so.

■ Nor is there any basis for a finding that the Johnson Act, 28 U.S.C. § 1342, deprives this Court of jurisdiction over the

---

25. Municipal and quasi-municipal corporations are subject to vicarious liability in Pennsylvania for the negligence of their servants. *See*

*Morris v. Mt. Lebanon Twp. School Dist.*, 393 Pa. 633, 144 A.2d 737 (1958).

present controversy. None of the courts which have dealt with similar utility cases has found that the Johnson Act strips it of jurisdiction over the constitutional claim asserted. Moreover, the Johnson Act is inapplicable in the context of the present case because "this is not an action to enjoin the operation of 'any order affecting rates chargeable by' [the utility], and [it] is . . [therefore] outside the operation of 28 U.S.C. § 1342." *Limuel v. Southern Union Gas Co.*, 378 F.Supp. 964 (W.D.Tex.1974).

An Order will be filed reflecting the decisions set forth in this Memorandum.