Margaret **HENDRICKSON**, et al.

v.

**PHILADELPHIA GAS WORKS**, et al.

Civ. A. No. 84–1586.

United States District Court,
E.D. Pennsylvania.

.

Oct. 6, 1987.

Irwin Trauss, Community Legal Services, Inc., Philadelphia, Pa., for Hendrickson, et al.

Tyler E. Wren, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Philadelphia Gas Works, et al.

MEMORANDUM

GILES, District Judge.

## FACTUAL BACKGROUND

In this action, plaintiffs, who are residential gas users or applicants for such service, challenge certain policies and practices of the Philadelphia Gas Commission, Philadelphia Gas Works ("PGW") and the Philadelphia Facilities Management Corporation ("PFMC") as being violative of various constitutional rights. Plaintiffs have also sued several individual officers and employees of defendants.

Essentially, the claims fall into three categories: 1) entitlement to pretermination due process hearing, with written notice of reasons in all circumstances, regardless of considerations of unauthorized use of gas or evidence of meter tampering at the property serviced or other safety considerations; and 2) entitlement of an occupant of a premises, other than the named customer, to obtain or continue service in his own name without first satisfying another's indebtedness for non-payment for gas service; and 3) entitlement to be free of the arbitrary denial of gas service at employee discretion under the guise of "good and sufficient reasons", in violation of the defendants' own regulations.

Plaintiffs filed this action in May, 1984 as a class action and seek both compensatory and punitive damages as well as injunctive relief as to the alleged offending practices. Promptly following the commencement of the lawsuit, the court presided at a temporary restraining order hearing wherein the five named plaintiffs sought immediate relief from the cessation, or non-extension, of gas service. Solutions were found for the immediate needs of the plaintiffs without prejudice to the claims or defenses raised by the litigation. The court urged the Gas Commission and PGW to adopt specific regulations and procedures which would address generally the notice, hearing and other concerns evident from the complaint. This was done with the hope that the parties would resolve

their disputes without the need for further litigation. In November, 1985, the Gas Commission promulgated new customer service regulations.[1]

In addition to filing a motion for class certification, plaintiffs filed a motion for partial summary judgment. The defendants have opposed the class certification and have themselves moved for summary judgment claiming that the named plaintiffs had no protectable property interest under the circumstances presented and that, in any event, the constitutional issues are moot in light of the new regulations.

### DISCUSSION

A. *The Philadelphia Gas Commission, PFMC and PGW Are Municipal Entities Synonymous With the City of Philadelphia for All Purposes Under 42 U.S.C. § 1983*

■ The Philadelphia Gas Commission is an operating arm of the City of Philadelphia responsible for the setting of rates and operating regulations by reason of Article III, §§ 3–100 and 3–309 of the City's Home Rule Charter. *Dawes v. Philadelphia Gas Commission, et al.*, 421 F. Supp. 806, 815 (E.D.Pa.1976). It oversees the general operations of PGW which is not, itself, an identifiable entity. *Id.* at 811, fn. 1. It is merely a collective name for the real and personal property used to furnish gas service to customers within the City. *Id.* PFMC is a non-profit corporation which manages PGW for the "sole and exclusive benefit" of the City pursuant to municipal ordinance. *Id.* at 815. Although it has the status of a "private" non-profit corporation, PFMC was organized by the City and is devoted to carrying out governmental functions of the City and is, therefore, a municipal authority for the purpose of managing the City's gas service. (Amended Complaint, ¶ 5). The Chief Executive Officer of PFMC is alleged to be the overall manager of PGW.

Contrary to plaintiffs' contentions, the Philadelphia Gas Commission is not a public utility regulated by the Pennsylvania Utility Commission pursuant to the Public Utility Code, 1978, July 1, P.L. 598, Act No. 116, 66 Pa. C.S.A. § 101, *et seq.* Municipal corporations, which include all cities of the Commonwealth and any entity of public character which exists for the purpose of rendering service similar to that of a public utility, are exempt from regulation under the Public Utility Code so long as the service is provided within the City's corporate limits as a public service. *Borough of Phoenixville v. Pennsylvania Public Utility Commission*, 3 Pa. Cmwlth. 56, 280 A.2d 471 (1971).

Plaintiffs argue that inasmuch as the court in *Dawes v. Philadelphia Gas Commission, supra,* ruled that the municipal agencies here were subject to regulation under the Public Utility Code, the principles of collateral estoppel mandate that this court regard that ruling as a finding of fact binding upon them here. *See, Dawes* at 817. I decline to follow plaintiffs' urging because the ruling constituted no finding of fact but an impression of law, which was erroneous. As a matter of state statutory law,[2] the City's gas service system is exempt from state regulation.

Plaintiffs' claim of a constitutionally protected "property interest" necessarily derives from the municipal regulations under which gas service is extended to residents of the City.[3]

---

**1.** *See* PGW Customer Service Regulations 1.1–15.2, Nov. 20, 1985.

**2.** 351 Pa.Code § 3.3–100, 3–909.

**3.** At the time this action was filed in May, 1984, the Philadelphia Gas Commission regulations provided that PGW had the right to require a written application for gas service which upon acceptance would constitute a contract (2.2); to limit the amount and character of gas service it shall supply or to reject requests for initial or increased service to protect the supply of service to any customer or for other good and sufficient reason (2.4); to terminate service to any dwelling without prior notice or hearing, *inter alia,* where a gas leak on the premises which PGW finds to be hazardous, where unauthorized diversion of the use of the utility service exists or there has been installation of unauthorized equipment or tampering with meters or other utility equipment.

The unrebutted evidence[4] profferred through affidavits from defendants is that evidence of meter tampering or diversion of gas through the installation of unauthorized equipment constitutes inherent imminent danger to the health and safety of the serviced premises and occupants, as well as surrounding properties and the general public, requiring immediate remedial action. (Affidavit, Frank S. Gorman, PGW Supervisor, Technical Services). Moreover, it is undisputed that unauthorized and untrained persons who tamper with meters, piping equipment and appliances in a property can create safety hazards by using improper installation methods and apparatus which fail to meet industry standards and City licensing standards. Further, it is undisputed that theft and tampering incidents pose safety hazards because they either create apparent gas leaks or present unacceptable risks of an undetectable gas leak which cannot be left unremedied because of danger of explosion, asphixiation, or further tampering to attempt to cover up the unauthorized use.

## B. THE NAMED PLAINTIFFS

### 1. *Sigfredo Cruz*

■ Plaintiff Sigfredo Cruz complains that he was denied due process of law when, upon discovering a tampered meter in his basement and without prior notice, PGW terminated the gas service to his property.[5] He did not receive post-termination written notice from PGW either explaining the shut-off or advising him of any procedure by which he could protest the action taken or the conditions under which he could obtain a restoration of service.

He seeks to represent a subclass of customers or occupants of serviced premises who have been similarly affected by what he perceives as a taking of a property interest in continued service without due process of law. He contends that he was entitled to pretermination notice and hearing after PGW discovered the tampered meter but before any shut-off could occur. He further contends that termination of service could occur only if there was a factual determination that he was the person responsible for the tampering and unauthorized use of gas. The facts of the Cruz claim are as follows.

On March 27, 1984, during a routine check by a PGW leak survey crew, a leak was found in the sidewalk curb box that serviced the Cruz residence. The box was located directly in front of the property. It contained a shutoff valve that could be used to turn the service on and off. Gas detection instruments inserted into the curb box showed a reading of 100%, indicating a potentially explosive mixture of gas and air. Upon such a finding, PGW has the right under its Tariff to enter adjacent properties to check for accumulations of gas, even by forcible means.[6] PGW took immediate steps to enter the property. No one responded to PGW's attempts to gain entry by consent, that is, knocking at the door or ringing a doorbell. A serviceman gained access to the basement where the meter was expected to be located by prying open a basement screen. A gas detection instrument reading in the basement showed no detectable gas accumulation. The remainder of the house was not inspected as there was no basis to do so.

---

4. Plaintiffs submitted no counter affidavit from any gas service expert or other competent witness that countenances delay in immediate shut-off in such circumstances or counsels that it is unreasonable for PGW to be unwilling to accept the risk of the dire consequences that could flow from failure to take immediate termination action or to continue unauthorized gas service on any condition that PGW knows to be unsafe.

5. Plaintiff Cruz's gas service was in his own name.

6. Regulation 6.4 "Access to Premises."

a. Authorized agents of the company shall at all reasonable times, have the right to free access into the premises supplied with gas, for the purpose of examining, removing, or changing the meter, piping and gas-consuming equipment, and of taking whatever remedial action the Company may deem appropriate to avoid or abate hazardous conditions or unauthorized usage; and under emergency conditions to gain entry to the premises by forcible means.

b. All employees of the Company who are authorized to enter upon the Customer's premises shall display appropriate PGW identification on their person.

In the course of inspecting the gas meter in the basement, PGW observed that it had been reinstalled backwards and with the dial side facing the foundation wall. In this position, the meter could not record gas usage, yet permitted gas to come to the property. This was obvious evidence of tampering and unauthorized use of gas. Pictures of the reversed meter were taken. The meter was removed and the service line was plugged and capped to eliminate possibilities of further hazards and further tampering. A PGW street crew called to the scene dug up the street outside the property and determined that the gas leak was in the service line to the Cruz' home. The line had to be cut off at an underground point outside of the house to eliminate the leak.

PGW left no notice at the residence advising that the gas meter had been removed or as to why the gas service had been shut off. Cruz deduced that PGW had terminated the service and promptly contacted lawyers at Community Legal Services ("CLS"). Cruz' Deposition N.T. 15, 16, 19. The CLS attorneys promptly contacted PGW on Mr. Cruz' behalf. It was PGW's policy and practice at the time to give customers like Cruz the post-termination opportunity to contest the proposed restoration of service charges and to present any evidence that might warrant relief from or modification of the charges. CLS had post-termination discussions with the Claims and Insurance Department.[7] In such discussions, Cruz, through counsel, was advised of the reasons for the shut-off, was given the opportunity to respond, and was told of the charges to be paid to have the service restored. He was required to pay a standard by-pass charge, a $172.00 deposit representing two months of average gas usage and $152.05 representing one-half owed for actual meter gas consumption. An agreement was reached whereby, in return for the immediate restoration of service, Cruz paid $372.05, with the balance payable in later installments.

On March 26, 1984, PGW issued a $687.80 bill based upon a meter reading by Cruz. He complained about the bill to a local PGW office because it was significantly greater than billings for the same season of the previous years. Cruz testified at his deposition in this case that he read the gas meter in his basement and called in the readings to PGW. It is from this reading that his protest as to the billing arose. (Cruz Deposition, N.T. 7, 8). He claims that he had asked PGW to come out to read the meter. Prior to that occurring, the reversed meter was discovered. Cruz was asked if the PGW photographs taken of the meter facing the foundation wall accurately portrayed the meter as it existed in March, 1984 when he claims that he read it. He was also asked how he was able to read the meter, since the dial face was against the foundation wall. (*Id.* at 37–38, 25). He was instructed by his attorney not to answer these questions on the grounds that his answers might tend to incriminate him, invoking privilege under the Fifth and Fourteenth Amendments of the United States Constitution. Similarly, he was asked if he was aware that gas was being stolen at the property and whether anyone acting on his behalf moved the meter. Again, he invoked his Fifth Amendment privilege. (*Id.* at 18–19, 20).

It is clear that Cruz was not prepared before termination or thereafter to offer any explanation as to how the meter found by PGW in a reversed position got that way or even to deny that there was meter tampering and gas theft either by him or someone on his behalf. Without a sufficient explanation of the situation, the gas service to the Cruz property would have been cut off after a post termination hearing.[8] As a matter of law, plaintiff Cruz would be unable to prove at trial that he suffered any compensatory loss by reason

---

7. The Claims and Insurance Department at PGW is responsible for reviewing matters such as Mr. Cruz' protest of the shut-off and efforts to restore service.

8. In any event, he did have a post-termination hearing and service was resumed immediately upon replacement of the meter, payment of the charges necessitated by the shut-off and by-pass line and arrangements for the payment for gas actually used.

of the termination of service without prior notice and hearing.[9]

Not every "property interest" invasion by a state or municipality requires prior notice and hearing.[10] Where there are serious concerns which must be abated, the due process requirements are satisfied if the "notice and rudimentary hearing ... follow as soon as practicable." *Goss v. Lopez,* 419 U.S. 565, 583, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1974). In *Goss,* the Court found that since Ohio statutorily extended to the students in question the right to public education, they had a property and liberty interest in continuing their education such that the state could not withdraw that right without grounds of misconduct and absent fundamentally fair procedures to determine whether the misconduct had occurred. *Id.* at 573–574, 95 S.Ct. at 735–36. However, the Court recognized that there are recurring situations where prior notice and hearings cannot be insisted upon. "Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school," *Id.* at 582, 95 S.Ct. at 740, so long as a prompt post-removal notice and hearing is given. In the issue at bar, the undisputable safety concerns presented by the tampering at the Cruz property and the unavoidable duty upon the service provider to take immediate steps to abate the hazard warranted termination without prior notice and hearing.

Assuming that Cruz had a property interest in continuing service at the time of investigation of the gas leak, the question remains as to what process was due. *Goss v. Lopez, supra,* at 577, 95 S.Ct. at 738,

quoting *Morrissey v. Brewer,* 408 U.S., 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1971). Application of the due process clause is an "intensely practical matter," *Goss* 419 U.S. at 578, 95 S.Ct. at 738, that "negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Plaintiff's insistence that no abatement action can be taken in hazardous situations determined by PGW to require shut off until there has been written notice, a hearing and a determination of fault is entirely misplaced. Safety considerations constituting emergency conditions carve an exception out of the ordinary notion of pretermination notice and hearing procedure.

Plaintiffs cite *Dawes v. Philadelphia Gas Commission, supra,* and *Myers v. City of Alcoa,* 752 F.2d 196 (6th Cir.1985) for the proposition that in every situation there must be prior notice and hearing before termination of a utility service supplied by a state or municipality. *Dawes, supra* and *Myers supra,* do not purport to address the emergency safety concerns presented in the Cruz situation. *Dawes* is limited by its facts. The *Dawes* court prohibited the termination of gas service for alleged nonpayment of bills without adequate notice and opportunity for predetermination hearing. It had no occasion to address the safety exception recognized in *Goss.* Likewise, *Myers,*[11] did not concern imminent danger presented by continuation of the utility service. In that case, the supplier of the service determined that there had been an unlawful removal of its meter and replacement with a stolen meter-

---

9. Plaintiff Cruz has not satisfied the requirements of a constitutional tort claim. To establish a constitutional tort claim, Cruz must show that he has been deprived of a protectible right or a legitimate claim of an entitlement and that the party depriving him of such a right engaged in outrageous behavior or an abuse of official power. *Davidson v. O'Lone,* 752 F.2d 817 (3d Cir.1984). Cruz fulfilled the first prong of the test but failed to satisfy the second prong of the test.

10. *See Mathews v. Eldrige,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

11. *Myers v. City of Alcoa,* 752 F.2d 196 (6th Cir.1985), is inapplicable to this case on other grounds. Meyers, read in its broadest sense, stands for the proposition that under Tennessee state law notice of hearings is required before terminating utility service to a customer. This right would occur even where there is suspicion of unauthorized use of service. The right, however, is based upon a Tennessee statutorily created right to continued electrical service.

ing device of another utility company. The customer denied any knowledge or participation in the unlawful acts. In *Myers* the plaintiff's action did not present safety concerns for the customer, the public or the utility. Moreover, the *Myers* court recognized that imminent danger considerations could justify departure from prior notice and hearing requirements. *Id.* at 199–200, citing *Jackson v. Davis*, 530 F.Supp. 2 (E.D.Tenn.1981), *aff'd*, 667 F.2d 1026 (6th Cir.1981) (building unsafe because of defective or dangerous electric wiring system and service disconnected where continuation of service presented safety and health hazard). Here, the undisputed evidence is that continuation of service through a tampered meter presented an unacceptable risk of catastrophe. Therefore, termination was a necessary and responsible precaution undertaken by PGW.

Finally, Cruz' claim that he was entitled to continued gas service despite evidence of meter tampering and unauthorized usage erroneously assumes that the source of his property interest is the Pennsylvania Public Utility Code, 66 Pa. C.S.A. § 1501. The Code mandates that "[e]very public utility shall furnish and maintain adequate, efficient, safe and reasonable service and facilities [and] such service shall be reasonably continuous and without unreasonable interruption and delay." *Id.*[12] *Dawes, supra.* As a matter of law, the Philadelphia Gas Commission and its subsidiary instrumentalities, are exempt from regulation under the state Code, 351 Pa. Code § 3.3-100, 3-909. Plaintiff's property interest, if any, derives from the regulations promulgated by the Philadelphia Gas Commission. Cruz had no property right based on statute or PGW regulation to continuation of service where a dangerous condition or unauthorized use of gas existed.

After obtaining service, plaintiff became entitled to be free of arbitrary or irrational action by the utility through receipt of notice and hearing as soon as practicable after abatement of the conditions giving rise to the claim of apparent or potential hazards.[13] This court finds that Mr. Cruz was not entitled to pretermination notice and hearing, but was entitled to a prompt post termination hearing.[14] Cruz was ac-

---

12. Even if the Code did apply, the terms of the statute would not preclude an exception to pretermination notice and hearing for abatement of conditions presenting imminent danger to public life and property. Indeed, one of the specific charges of the Code is that the public utility shall furnish safe service for the customer and the public. The Code specifically allows the alleviation of an emergency or condition dangerous to life or property without prior notice to the customer. 66 Pa.C.S.A. § 1503. Furthermore, the Public Utility Commission has promulgated a regulation which provides [i]f fraudulent use of gas is detected, or if the regulating measuring equipment of the utility has been tampered with, or if a dangerous condition is found to exist on the premises of customers, the gas may be shut off without notice. 52 Pa.Code § 59.24(b). Therefore, whether the source of plaintiff's property interest was the Public Utility Code or the Philadelphia Gas Commission regulations, the result would be the same.

13. At the time of Cruz' actions, no such regulation existed establishing such an entitlement. Since that time the Philadelphia Gas Commission has codified such an entitlement. *See* Customer Review Unit Notice and Hiring Procedure, n. 3 PGW Regulations, March 7, 1986.

"Utility source to any dwelling ... may be terminated by PGW without prior notice upon PGW's knowledge or reasonable belief that termination is necessary for safety related reasons. Such reasons shall include:

1. A gas leak on the customer's premises, or other condition which the Company finds potentially hazardous....

2. Unauthorized interference with a diversion or use of the utility service delivered on or about the affected dwelling or account.

\* \* \* \* \* \*

4. Tampering with meter or other utility equipment."

14. In *Memphis Light Gas & Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), a case involving non-payment of bills to a utility because of incorrect billing, the Court held that a pretermination hearing was necessary before termination of service. The Court reasoned that a pretermination hearing "could be afforded well in advance of the scheduled date of termination." *Id.* at 18, 98 S.Ct. at 1565. In the instant case a pretermination hearing could not have been afforded in advance of the scheduling date of termination. Termination was due to plaintiffs' tampering with the meter. The tampering endangered other residents in the area. Thus termination was a necessary procedural safeguard.

This procedural safeguard was a necessary concern of PGW which outweighed plaintiff's

corded a post termination hearing where he was accompanied by counsel.[15]

The Philadelphia Gas Commission has amended its regulations to provide that the termination of service without notice shall be limited to safety reasons, which shall include gas leaks or other potentially hazardous conditions, unauthorized interference with, or diversion or use of gas delivered to the dwelling, installation of unauthorized or prohibited equipment, tampering with meters or any other condition which may endanger the safety of any person or property or may prove harmful to the energy delivery system of the company. PGW Regulation 4.11.

Effective December 25, 1985, the Philadelphia Gas Company adopted regulations requiring that written notice be left at the property stating the reasons for the shutoff and a statement of the rights and procedures available to the customers of record to dispute the shutoff if they choose to contest the action. In the case of a gas leak or other no-fault condition, the service will be restored when the necessary repair is made. In all instances of possible intentional misconduct, the customer must call PGW to schedule a hearing at a telephone number given or come to a given address. A decision on resumption of service must be made in writing within two business days of the customer's application for continued service. PGW Regulation 2.4 (March 7, 1986). The two day time period is reasonable for all parties concerned. The time period allows PGW to complete an investigation and allows the customer to obtain legal counsel if desired since the factual basis for terminating service because of intentional misconduct could suffice for criminal charges.

For these reasons, defendants are entitled to summary judgment on plaintiff Cruz' claim. Cruz suffered no violation of his constitutional due process rights. He offered no proof that PGW erred in concluding that he knew that the meter had been tampered with and that gas was being stolen. Therefore, he offered no proof to support the claim of a loss of an entitlement. Because the regulations as adopted meet the prompt notice and hearing requirements of the due process clause, the proposed subclass which Cruz was alleged to represent will not be certified.

## ENEIDA RODRIGUEZ

■ In her complaint, Eneida Rodriguez claims that she was denied continuation of gas service without due process of law. After discovery of meter tampering and theft of gas at her property, PGW shut off the service and required that, as a condition of restoration of service, she pay a certain sum. Rodriguez filed a Chapter 13 petition under the Bankruptcy Code. PGW insisted on the payment despite the existence of the petition. She claims that the restoration charges were contrary to the Philadelphia Gas Commission regulations and that she was treated differently because of the unauthorized usage.

In support of their motion for summary judgment, defendants have submitted the affidavit of William Oland, PGW Manager of the Collection Department, which attests that on July 20, 1983 gas service was terminated to Rodriguez' property from the street curb box for non-payment of her bills after notice and opportunity for hearing. A final meter reading was obtained on August 16, 1983 and a final bill was sent to Rodriguez in September 1983. There was no dispute of the shut-off by Rodriguez. Based upon information that there was a possibility of unauthorized usage at the property, an investigation by the Meter Investigation Unit was conducted on January 19, 1984. PGW found that the gas service had been turned on in an unauthorized manner and that nails had been jammed into the meter dials to keep them from functioning and recording the gas usage. The gas was being used by Rodriguez to fuel a house heater, water heater and

---

need for a pretermination hearing. *See Mathews v. Eldridge*, 424 U.S. 319, 334–335, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

**15.** At the time of the shut-off, the Philadelphia Gas Commission had not adopted a regulation as part of the PGW tariff formalizing a post-termination procedure.

range. With her knowledge, PGW removed the meter and terminated the service from within the property. Within three days of the termination, Rodriguez telephoned PGW.

Rodriguez has not countered PGW's affidavit in any way. She has not made herself available for discovery to either PGW or her attorneys. Therefore, on considering defendants' motion for summary judgment, the facts set forth in the Oland Affidavit must be taken as uncontested.

Rodriguez does not deny theft of the gas or tampering with the meter. She complains that she was not told accurately what procedures to follow or amounts to be paid to get the gas service restored and that PGW had no procedure by which she could obtain a hearing on the reasons for the shut-off of the service.

When Rodriguez telephoned PGW she was initially given erroneous information by defendant Sam Hart, a technical assistant of PGW's gas theft unit. He told her that the amount was in excess of $2,500. There is no allegation that Hart's error was the result of anything other than negligence. Not being satisfied with Hart's response over the telephone, Rodriguez went to the local PGW office and spoke to a PGW representative. She was advised that the amount owed was $2,843.67 and that to have the service restored she would have to pay a total of $873.07.[16] Because she believed she had no assets or financial ability to pay the charges, she filed for bankruptcy.[17]

In analyzing Rodriguez' claim, the court notes that in September, 1983, she did not protest the termination of the gas service

for non-payment. Instead, the gas service was restored by someone other than PGW. She does not contest the fact that after the September, 1983 gas shut-off, she or someone with her knowledge and permission turned the gas back on and tampered with the meter in such a manner that usage could not be recorded. She had no property right in continuation of service that she was not authorized to receive or to pretermination or post-termination notice and hearing related to shut-off of the service after the on-going customer contract had ended.

After the September, 1983 shut-off, she was placed in the position of having to reapply for service. Upon her reapplication, despite a history of unauthorized use and tampering, she was not denied service, but rather was told that she would have to pay $873.04 and make arrangements to pay the balance owed. She was given an itemized breakdown of the charges. She was represented by counsel. She was allowed to grieve through an internal review procedure which existed at PGW.[18] Rodriguez did not avail herself of the procedures known to her and her attorneys.[19]

Rodriguez also complains of a $48.00 fee included in the PGW turn-on charge. The $48.00 fee is imposed by PGW as a "matter of long-standing policy." Rodriguez complains that this policy is not authorized by the Philadelphia Gas Commission tariff, but did not challenge this policy before the Commission. She complains here that the policy as applied to her violates the equal protection clause of the Fourteenth Amendment. This argument must be rejected. If

**16.** At the same time, she was given a written form which detailed what she owed and itemized the turn-on charges. From the face of the written sheet, it was clear that the representative, too, had misspoke as to the total amount owed since the form reflected the sum as $1,740.34, less than what she had been told. However, the turn-on charges were accurately stated as $873.07.

**17.** Plaintiff filed for bankruptcy hoping to cause PGW to turn on the gas service by persuading it to accord her the benefit of an automatic stay against indebtedness occurred prior to the filing of the petition.

**18.** PGW has an initial review procedure to address customer complaints involving claims of unfair charges or bills or claims that it acted in violation of a tariff. Moreover, an appellate procedure exists for unresolved disputes. Appeals are taken to the Philadelphia Gas Commission. See PGW Gas Service Tariff No. 8, May 30, 1983, 4.41–4.47.

**19.** Affidavit, Teresa M. Maloney, Assistant Vice President, Customer Services, ¶ 4; Affidavit, William Oland, ¶ 3.

the charge is uniformly applied to all applicants, there can be no just complaint of unequal treatment. In claiming that the $48.00 turn-on charge violates the equal protection clause, plaintiff is making a veiled due process claim; that is, plaintiff is claiming that the $48.00 turn-on fee violates the PGW Tariff. However, plaintiff cannot effectively complain about a denial of due process because an appeal process to the Philadelphia Gas Commission existed at the time of plaintiff's claim. Plaintiff failed to exhaust the administrative remedies provided by the Philadelphia Gas Commission. It would be inappropriate for this federal court to interpret the Tariff and Regulations of the Philadelphia Gas Commission, especially where PGW claims that the existing regulations authorize the action taken. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984); *In Re Begley*, 46 B.R. 707, 717 (E.D.Pa.1984). PGW contends that Regulation 6.3 of the Tariff authorized the $48.00 charge, the requirement that damages caused be paid for, and satisfactory assurance given that no damage shall be caused in the future. That regulation reads:

> 6.3 TAMPERING—THEFT. The Company reserves the right to remove any of its property which has been damaged [20] or which, in reasonable prospect of being damaged or where there is evidence that such property has been tampered with, and the Company shall be under no obligation to replace such property until the damage has been paid for and satisfactory assurance given that no damage shall be caused in the future. Instances of tampering or theft of gas or other Company property may be subject to prosecution.

PGW also submits that it finds in Regulation No. 2.4 discretion to impose reasonable conditions in addition to those which may otherwise be specified in other parts of the regulations. That section reads:

> 2.4 RIGHT TO REJECT—The Company may limit the amount and character of gas service it shall supply or may reject requests for initial or increased service if this is necessary to protect the supply of service to any customer (5) or for other good and sufficient reasons.

PGW offers that of the $48.00, $40.00 is for labor costs of removing and restoring service and $8.00 is for administrative costs. Of the $40.00, $20.00 includes the turn-on charge specified in the regulation.[21] Affidavit, Oland, ¶ 4.

Rodriguez contends that the Regulations must be read to give their words plain meaning. She contends that damage in Regulation No. 6.3 means physical damage, that Regulation No. 8.3 specifies the "turn-on charge" of $20.00 and that the "good and sufficient language" of Regulation 2.4 gives PGW no authority to add to the limitations on its power already expressed in the Regulations. This court's review of the charge or billing dispute in Rodriguez' case convinces it that PGW's interpretation of the Regulation cannot be deemed arbitrary or irrational. The word "damage" embraces physical damage and other costs. If a civil suit were brought for property damage and theft, or a criminal prosecution initiated with PGW as the victim, the damages recoverable could embrace physical damage and all out-of-pocket costs associated with returning the company service to the safe operational status it had enjoyed before the damage occurred. Moreover, the same Regulation empowers PGW to obtain satisfactory assurances that damage will not occur in the future. If PGW were to interpret this as authority from the Philadelphia Gas Commission to devise a uniform practice of recovering its total costs and letting the actual and potential perpetrators know that it will not underwrite their unauthorized use, tampering, or other damage to the delivery of safe and efficient

---

**20.** PGW contends that "damages" includes physical damage, labor and administrative costs of terminating, restoring and preventing the recurrence of damage or theft in the future.

**21.** 8.3—If a Customer's meter is removed or gas service is discontinued because of any violation of the Company's Rules and Regulations, the restoration of service will be subject to a payment of $ in advance of $20.00....

gas service, that too would be a rational interpretation.[22]

Rodriguez further complains that she was required as a condition of service to make payment for "estimated usage" for the period between the final bill in September 1983 and the removal of the meter on January 19, 1984. This was in fact a charge for the estimated amount of gas that was used without authority. This was not gas supplied under a customer agreement. The payment due was comprised in part of the damage suffered by PGW. PGW had the authority to recover such damage before restoring service. Regulation 6.3. Rodriguez' claim that she could take gas and then claim coverage under the protection of payment schedules in the tariff is simply ludicrous. The protection of payment schedules exist for the repayment of authorized gas service. Regulation § 3.51(e). The Regulations properly do not provide a payment agreement for unauthorized usage.

Rodriguez next complains that she did not receive a bill for gas during the time in which she was an unauthorized user and that, therefore, she should not have to pay. This argument is also without merit. During the period in dispute, she was not a customer. As a non-customer, plaintiff possessed no due process rights.

Plaintiff's attorneys assert in their brief in support of partial summary judgment, p. 37–38, that PGW demanded the full amount of the charges due for this "estimated usage." PGW has disputed that it demanded full payment for the estimated usage charges. *See* Oland Affidavit. Plaintiff did not counter the PGW contention. Therefore, PGW's denial on this score must be taken as undisputed. Moreover, a Security Deposit Request given to Rodriguez on March 7, 1984, further evidenced PGW's allegation that Rodriguez

was charged one-half ($357.67) of the total ($715.33) charges for usage demanded.[23] PGW is authorized to demand full payment of the amount owed for unauthorized usage. Regulation No. 613. It follows that there is no due process violation for PGW to demand payment of one-half of the amount owed by Rodriguez.

Finally, Rodriguez claims that she was denied due process of law when, on April 10, 1984, PGW demanded that she pay $1,103.33, despite her Chapter 13 petition. She had refused to acknowledge the indebtedness to PGW or accept the payment conditions that had been proposed to her. The $1,103.33 demanded represented the bypass charge, estimated unauthorized usage, and the meter damage charges, all directly related to the theft of gas by Rodriguez. It did not include any of the delinquency accrued before the shut-off in September 1983 when Rodriguez was a customer. Plaintiff now claims that PGW violated her rights under the Bankruptcy Act, 11 U.S.C. §§ 362, 366, by refusing to restore service unless she paid these pre-petition charges. The claim must be denied because the charges were unrelated to the commencement of the bankruptcy action or collection of a debt related to services rendered by the utility. The charges were based on meter tampering and unauthorized usage.

Normally, the filing of a petition in bankruptcy operates as an automatic stay of "... any act to collect, access or recover a claim against the debtor [which] arose before the commencement of the case under this Title ..." 11 U.S.C. § 362(a)(6).

Section 366 of the Act provides:

(a) Except as provided in subsection (b) of this section, a utility may not alter, refuse or discontinue service to, or discriminate against, the trustee or debtor

---

**22.** It appears that the Philadelphia Gas Commission has implicitly approved the $48.00 by-pass charge as consistent with the tariff authority. Affidavit, Oland, ¶ 4, re appeal of Jean Whaley, January 7, 1986. Although no articulation or rationale for the decision was given by the Commission, this is further evidence that it perceives that PGW has authority to require a payment under the Tariff.

**23.** It was PGW's policy and practice to require of persons responsible for unauthorized usage, payment of at least 50% of the total of the unauthorized use and allow the balance to be paid over time under an agreement.

solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

Such utility may alter, refuse or discontinue service if neither the trustee nor the debtor within 20 days after the date of the order of relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

11 U.S.C. § 366(a). The general rule is that a utility cannot refuse to continue service to a debtor *solely* on the basis of an unpaid pre-petition debt. 11 U.S.C. § 366(a). However, since the basis of PGW demand was restitution in its capacity as victim of a crime, there was no violation of § 366(a). After considering the salutary purposes of § 366 and the public safety aspects of tampering and unauthorized use of gas, it has been held that the duties imposed by § 366 of the Code on utility companies do not apply where the utility is able to prove that tampering and/or unauthorized gas usage took place on the debtor's premises within a reasonable time period prior to the debtor's request for reinstitution of service and the debtor was responsible for or knowingly permitted the theft or destruction of property. *See In re Webb*, 38 B.R. 541, 544–45 (Bkrtcy.E.D.Pa.1984); *Hennen v. Dayton Power & Light Co.*, 17 B.R. 720, 724 (Bkrtcy.G.D.Ohio, 1982); *In re Broadnax*,

37 B.R. 909 (Bkrtcy.E.D.Pa.1984). Here, Rodriguez does not contest that she, or someone other than PGW acting with her permission or knowledge, restored gas service and tampered with the meter so that usage could not be recorded.

PGW's policy of requiring persons responsible to make restitution for their theft or knowing participation in it despite a bankruptcy petition is rational and reasonable and cannot be shown to have been discriminatorily applied to Rodriguez or any of the class she purports to represent. Rodriguez did not seek relief from the PGW restitution requirements through the bankruptcy court. PGW had the right to demand the restitution and the bankruptcy court had the right to modify the demand after notice and a hearing for all concerned. Rodriguez chose not to initiate relief in the bankruptcy court. Instead, Rodriguez chose to seek relief from this court under 42 U.S.C. § 1983.[24] Rodriguez failed to exhaust the remedies provided to her by the Bankruptcy Act. For a federal district court to award damages for an alleged violation of the Bankruptcy Act where the bankruptcy court's jurisdiction has not been invoked would be improper.

For the foregoing reasons, the § 1983 claims of Rodriguez are dismissed and the court denies the petition to certify a subclass of persons she proposes to represent. The proposed class would consist of persons who were unauthorized users of gas and each of whom would have to decide whether to waive a Fifth Amendment privilege. Therefore, the decision to be a member of the class would of necessity be an individual decision destroying the commonality and typicality elements required under Fed.R.Civ.P. 23(a).

### MARGARET HENDRICKSON

■ The claim of plaintiff Margaret Hendrickson represents yet another instance of unauthorized gas use at a proper-

---

**24.** The Bankruptcy Act provides a full procedure and remedy for alleged violations of the Act. *Begley v. Philadelphia Electric Company*, 41 B.R. 402 (E.D.Pa.1984), citing, *Middlesex City Sewage Authority v. National Seaclammers Asso-* *ciation*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Allegheny City Sanitary Authority v. U.S. Environmental Protection Agency*, 732 F.2d 1167 (3d Cir.1984).

ty after the service had been properly terminated and an effort on the part of the plaintiff to represent persons who are similarly situated. As with Rodriguez, Hendrickson and the class she purports to represent would have to waive their Fifth Amendment privilege to prove their claim and to prove damages.

On May 4, 1983, the gas service to 3414 Hartel Street under the name of H.E. Hendrickson was terminated for non-payment after notice and a hearing by PGW. (Affidavit, William Oland, Defendants' Exhibit G, ¶ 2). The service had either been in the name of plaintiff's father who died in 1977 or that of her brother who had the same name. In the Amended Complaint, Hendrickson alleges she had no ownership interest in the house and that from the time of her father's death until July 28, 1983, her brother continuously excluded her from the property but that on that date he permitted her to move into the Hartel Street property with him. (¶¶ 20–24). She alleges that she had an oral agreement with her brother to pay to him $30.00 a month for gas. On August 16, 1983, following up on information from a PGW meter reader, PGW visited the property to conduct a routine safety check. Margaret Hendrickson refused the request to inspect the gas meter and shouted obscenities at the PGW employee.[25] Inspection showed that the gas service was being used through an apparent self turn-on. Plaintiff continued verbally to abuse the PGW employee directing that he leave the property. He did so. (Affidavit, Oland, ¶ 3). To eliminate the potential safety hazard and to prevent further unauthorized usage of the gas, the service to the property was terminated by digging up the street and cutting it off at an underground point outside the house. (*Id.* at ¶ 4).[26]

On or about October 1, 1983, plaintiff alleges that her brother moved out of the property. She remained. (Amended Complaint, ¶ 27). On or about December 15, 1983, she alleges that she visited a local office of PGW and sought to obtain gas service in her own name but was denied. She alleges in the complaint that she was given nothing in writing explaining the denial and was not advised of the availability of a procedure by which she could protest the denial. On or about December 23, 1983, plaintiff's attorney contacted PGW on her behalf and was told that the service could be restored to the property and placed in her name upon the payment of $557.49 which represented the value of the unauthorized usage and the charges associated therewith, including those for the shut-off of the unauthorized service. It did not include any amount of the $636.40 delinquency that was outstanding at the time service was terminated in May, 1984 when the customer was H.E. Hendrickson. (Affidavit, Oland, ¶ 5; Amended Complaint, ¶ 37). Plaintiff's attorney was told that $133.49 represented the cost of unauthorized gas usage, $158.00 was the required deposit, $20.00 was the turn-on charge and $246.00 was the cost of digging up the line for termination of the unauthorized use.

At the time plaintiff sought to obtain service in her own name, she had an undivided interest in the Hartel Street property and her brother and sister were guardians for her since she was then only eighteen. (Hendrickson Deposition, p. 71). But she had no evidence of where she lived or proof that she had the right to occupy or control the premises to which she sought gas service in her name. (*Id.* at 72).

She claims that she was first told that she would have to pay the delinquency charges attributable to her brother when there was an account in his name. This is denied by PGW as a matter of fact and as contrary to its practice and as contrary to the Tariff Regulations. However, this factual disagreement is not material since it is undisputed that at the time she applied she was not eligible for service in her name. She was impecunious, unemployed, without credit, and presented no means to pay the ordinary security deposit as an on-going service charge. (Amended Complaint,

---

**25.** Plaintiff later consented to PGW admittance escorted to the basement of the house. The PGW employee was escorted by police.

**26.** PGW operated within the tariff regulations by terminating service after such discovery.

¶ 40). Moreover, she had no lease, oral or written. Having no document or other proof attesting that she was entitled to occupy the property or that she was able to pay or have the services paid for her, she was not eligible to be a customer under the then existing Philadelphia Gas Commission Regulations.[27]

**27.** 3.51 CREDIT AND DEPOSIT STANDARDS

a. PGW shall provide the applicant for residential service a written explanation of PGW's credit and deposit procedures and standards, in such form as shall be approved by the Philadelphia Gas Commission.

b. PGW shall provide service without requiring a deposit when the applicant satisfies one of the following requirements:

1. The applicant has been a customer of record with PGW within a period of 48 consecutive months preceding the date of the application and has had a satisfactory payment record. For the purpose of this subsection, an applicant will be deemed to have a satisfactory payment record if the final bill for prior service has been paid, unless the final bill for prior service was paid to restore service after a non-payment termination.

2. The applicant supplies satisfactory credit references in writing from their former suppliers of utility services.

3. The applicant provides information demonstrating that he is not an unsatisfactory credit risk. The absence of prior credit history does not of itself, indicate an unsatisfactory risk. PGW may request and consider information including but not limited to: the name of the employer of the applicant, place and length of employment, residence during the previous five years, letters of reference, credit cards, and any significant source of income other than from employment.

c. If PGW shall decline credit pursuant to this section, written notice of the specific reason(s) for such rejection shall be given to the applicant within two business days commencing the day after the application is made. The notice shall also include:

1. The amount of the required deposit, the method of calculation and the manner in which it can be paid;

2. If the refusal to grant credit is based on information from a credit reporting agency, the name and address of the agency, and a statement that a copy of the credit report can be obtained by the customer and the information in the report challenged;

3. Any other reason for credit rejection.

4. A description of the process by which an applicant may appeal the Company's decision.

d. If the investigation and determination of credit status is not completed within the time period specified in subsection (c) of this Regula-

The Regulations, taken together, show that PGW does not have authority to make a tenant a customer, except where the property owner has authorized the service and agrees to be ultimately legally responsible as a landlord-customer for gas service or permits the tenant to stand in the shoes of a landlord-customer.[28] A tenant cannot,

tion, PGW shall provide written notice of this fact in writing to the applicant along with specific reasons for the delay.

3.52 SECURITY DEPOSITS

a. If an applicant does not establish credit pursuant to Rule 3.51 of this section, PGW may require a security deposit in an amount equal to two times the average or anticipated monthly bill for service to the account for which the customer is seeking service.

b. The average or anticipated monthly bill for purposes of this section shall be based on consumption during the previous 12 months or such shorter period for which PGW has records, unless the applicant can demonstrate that his/her expected usage will be substantially different from the prior occupant.

c. If it is determined that a deposit is required, deposit payments may be made on an installment basis as follows, for residential customers only: 50 percent of the specified deposit payable upon determination by PGW that security is required; 25 percent payable within 30 days of such determination; 25 percent payable within 60 days of such determination. Non-residential customers will be required to pay the full 100 percent of the security deposit upon determination by PGW that security is required.

d. A security deposit may be required for continued or renewed service.

4.61 TERMINATION PROCEDURES AND NOTICES TO TENANTS

Subject to Regulation 2.1, where the mailing or billing address or apartment designation of a customer with residential service is different from the service address or apartment designation, PGW shall assume that such customer is a landlord-customer and that the residents at the service address or apartment designation are tenants unless PGW has actual knowledge to the contrary.

4.63 EFFORTS TO COLLECT FROM LANDLORDS

Before terminating service to residential dwelling in which the customer billed is a landlord-customer, but the gas has been or is being delivered to and used by a tenant, PGW shall make reasonable efforts to seek collection from the landlord up to and including termination of gas service at the landlord's residence and at the landlord(s)' places of business located in the City of Philadelphia.

**28.** This is reasonable and rational since the supply of gas service requires the intrusion into the

herself, give away such property rights without authority from the landlord.

During this period of time, PGW had a uniform policy and practice of requiring that applicants provide evidence of ownership or tenancy at the premises where service is requested. That rule was consistent with the above quoted regulations and the general authority given to PGW to fashion rules to limit service to the benefit of property owners for good and sufficient reasons. *See* PGW Reg. 2.4.

Since Hendrickson was not entitled to initiation or continuation of gas service in her name,[29] she was not entitled to written notice and a hearing on the reasons for denial of her application. Hendrickson was not a customer of PGW and because she was not a customer, she was not entitled to due process from PGW.

Hendrickson claims that she should be allowed to represent a subclass of persons who are required by PGW to fulfill certain conditions before receiving gas service in their name. This subclass consists of persons required to pay PGW for unauthorized usage and related charges as a condition to receiving gas service. The PGW conditional requirement arises whether or not residents of the premises during the time of unauthorized usage had knowledge of such usage.

I find that Hendrickson is not an adequate representative of that purported class because she was not eligible to have the service in her name. Furthermore, I would find that she is an inadequate class representative because there are individual fact issues in her case which would predominate over any common issues. First, it is questionable whether Hendrickson was without knowledge of the unauthorized usage. While she denies knowledge that the gas was being stolen as of July, 1983, she knew that the service had been terminated

for non-payment in May, 1983 but was restored when she moved in in July, 1983. She also knew when she moved in that her brother was continuing to obtain electrical service and water service from a neighbor without authorization by a stripped pipe. (Hendrickson, Deposition, pp. 34, 44). She denied PGW access to the property after she was told by her brother that he had tampered with the meter and was illegally obtaining service. (*Id.* at 48). She required the PGW employee leave the premises after the discovery of illegal usage. PGW was then forced to shut-off service by digging up the street. Second, PGW told Hendrickson of the reason for the refusal of service. While the reasons were not in writing, she received notice and her attorney knew of the appeal procedure. Third, in order to be a member of the class Hendrickson purports to represent, each class member would have to prove the absence of knowledge of active or passive participation in theft. Such a showing would require waivers of the privilege against self-incrimination.

Plaintiff argues that the Philadelphia Gas Commission Regulations prohibit requiring a person who has been the beneficiary of a theft of gas to pay for the unauthorized service as a condition of receiving service in his/her own name. That argument misreads the applicable regulation, 3.51e. 3.51(e), which provides that:

> PGW may not require, as a condition of the furnishing of residential service only, payment for residential service previously furnished under an account in the names of persons other than the applicant unless a court has determined that applicant is legally obligated to pay for the service previously furnished.

Moreover, PGW did not charge Hendrickson for gas previously furnished under an account. PGW charged Hendrickson for

---

land and walls of the property and an acknowledgement by the owner of the essential right of PGW to invade the property without consent in an emergency for safety related circumstances.

**29.** Effective December 2, 1985, the Philadelphia Gas Commission adopted Regulation 2.1c which states that:

... Property owners must show a copy of a recorded deed or settlement papers, a property tax bill, or other proof of ownership or occupancy.

Lessee must show a copy of their lease, the rent book, receipts for rent payments, or a letter from the landlord or rental agents verifying their rental status.

gas service received after the account was closed; that is, unauthorized gas usage after the termination of service. PGW was entitled to cause all persons who were responsible for the unauthorized use to pay for the damages caused to PGW by reason of the unauthorized use.

Denial of an application to a household adult on the basis of participation in, or knowing enjoyment of, unauthorized gas service is a rational means of recouping damages. The method is also a rational method for deterring further unauthorized usage. PGW acted in a rational manner.[30]

## LINDA BRYANT

■ Linda Bryant claims that as a tenant in December, 1983, she was eligible to be a customer of PGW under the then existing Regulations. The court finds that she had no tenant relationship and was not an eligible applicant for service in her own name at that time.

She alleges that her father was the owner-customer of PGW until his death in June, 1983. She further claims that from 1972 to June, 1983, she had an oral lease agreement with her father to pay rent which included utilities. At the time of the father's death, the rent was $100.00 per month and only she and her three children lived there. The father died intestate, survived by four daughters. Plaintiff's siblings lived outside of the property. The estate of the decedent remained undivided. There is no allegation that the oral lease survived the death of the father or that rent was payable to the estate. Bryant continued to live in the serviced property receiving gas and paying bills, or parts thereof in the name of Ben Bryant her father. She did not tell PGW that her

father had died and continued to enjoy his senior citizen's discount until, according to her, she went to the local PGW office in November or December, 1983 to inquire about a gas delinquency bill that she had recently received. (Affidavit, Del Taylor, Manager Customer Relations Department, ¶ 2). The bill totalled about $1,300. She claims that at that time she asked that service be placed in her name, but that she was told that could not be done since she was responsible for the entire amount billed to her father's account.[31] She claims that she showed the PGW employees a copy of her father's death certificate but admits that she had no evidence of a lease agreement, no deed, and no entitlement to property in view of the unprobated estate. As a matter of law, she was not a tenant and, at most, was a prospective partial owner. As such she had no entitlement to service and any failure to give her written notice and to advise her of her right of appeal did not violate the due process clause of the Fourteenth Amendment. Had plaintiff notified PGW that Ben Bryant was deceased, the account would have been terminated and plaintiff would not have qualified for service as a customer-owner. Plaintiff has suffered no violation of her constitutional rights and no damage.

PGW could have properly required Linda Bryant to pay for the service that she received at the property in the name of her father after his death. When plaintiff's father died the customer relationship between him and PGW necessarily ended. Thereafter, plaintiff was the only recipient of the service and knowingly enjoyed PGW's ignorance of the death and the benefit of the senior citizen's rate to which she was not entitled. However, PGW could not

---

**30.** Effective December 2, 1985, the Philadelphia Gas Commission adopted Regulations requiring as to any rejected applicant that written decision be rendered stating the reasons service was denied, any conditions that must be met to obtain service, an itemization of the charge that must be paid to obtain service, as well as the legal authority for the charges imposed, and a description of the process by which the applicant can dispute PGW's decision. That decision is to be rendered within two business days of the application unless PGW explains to the ap-

plicant in writing the specific reasons for any delay. New Regulation 2.4. This regulation demonstrates that there is no need for injunctive relief as to the notice and hearing interests of rejected applicants.

**31.** On January 6, 1983, she signed a repayment agreement for continuation of service in the account of Ben Bryant. She defaulted on this repayment schedule and the service to the property was terminated in May, 1984.

require her to pay for the service supplied during her father's lifetime. The Regulations prohibited such a requirement and PGW denies that it required such an obligation from Ms. Bryant.

For the foregoing reasons, plaintiff Bryant is not an adequate representative of a subclass comprised of persons entitled to service, or those entitled to service but rejected. Moreover, the injunctive relief sought is not appropriate. The Philadelphia Gas Commission adopted a regulation effective December 2, 1985 permitting "occupants" of the property to obtain service in his/her name.[32]

### KIMBERLY LEFTWICH

 Kimberly Leftwich alleges that PGW violated her substantive due process rights because PGW employees at separate local offices told her on two separate occasions that she had to pay a security deposit of twice the anticipated monthly bill as a condition of obtaining gas service. Plaintiff alleges that this occurred in the winter of 1983 and in April of 1984. She complains that this requirement was in direct contradiction of Regulation 3.52 which provides that where a deposit is required, PGW *may* require 50% of the deposit payable immediately and 25% within 30 days and the remaining 25% within 60 days. She also complains that she should not have been required to post a security deposit since she had a good credit record. She asserts that she was not given written notice at anytime of the reasons for rejection for credit or any writing which explained either the security deposit requirement or the appellate procedures for unfair treatment.

PGW denies that it advised Leftwich that she had to pay a security deposit in full. PGW states that according to its records, Ms. Leftwich made one application for service—on April 22, 1984. She was told that she need pay immediately only one-half of the required deposit to obtain service, thus fulfilling its requirements under Regulation 3.52.

The parties have filed cross-motions for summary judgment. For the reasons which follow, both motions must be denied.

Despite the specific allegations in the unverified Complaint, Leftwich's deposition taken under oath demonstrates that she has no recollection of the amounts of money that she was told by PGW employees would have to be paid as security. In the spring and winter of 1983, she testified, she went to the Frankford Office to seek gas service. On both occasions, she spoke to a customer contact representative (Leftwich Dep., p. 7–8). She was told that she had to pay a deposit, allegedly, but she cannot recall the exact amount or how the amount stated was calculated. (*Id.*, at 11–13, 17). On both occasions, she recalls, the representative wrote down the amount necessary, but she did not get a copy because she did not have the money necessary to meet the payment requirement (N.T. 19–20). On the third occasion, in April 1984, she went to the Broad and Erie office and spoke to a black female PGW representative. Again, she admits being told the amount that she would have to pay but cannot recall the amount (*Id.* at 20–23). She recalled seeing the amount on a computer screen and that the amounts of deposit quoted on the last two occasions were about the same (*Id.* at 23). She stated that she had no recollection whether or not she had been given anything on any of these visits which set forth the amount of deposit required (*Id.* at 25). It cannot be determined from her testimony whether she was asked to pay $34 or $68. (*Id.* at 30). Her testimony is insufficient to establish that she was told by PGW that the amount she had to pay was $68.00.[33]

PGW and defendant Jacqueline Richards, the Customer Representative with whom plaintiff spoke on April 23, 1984, have submitted an affidavit that, on the date in question, Leftwich applied for service, and

---

**32.** This new regulation provides for prompt written notice and review procedures regarding any rejection of the application. PGW Reg. 2.1c, 2.1g, 2.4d, 2.4e.

**33.** Plaintiff has never stated that she was willing to pay $34.00. She states she was willing to pay "one-half" (Leftwich Dep. p. 30) but she does not establish from what the one-half is derived.

it was determined by a routine credit check that a deposit would be required in the amount of $68.00. She was informed that $34.00 could be paid now and the remainder in 60 days, and she was given a form, pursuant to company practice, setting out the credit terms for the payment of the balance. Leftwich allegedly stated that she did not then have the money and would come in later when she did have it.

Leftwich has not countered with sworn testimony or affidavit which unequivocally state that she was not given a written form which stated the amounts of deposit required (*Id.* at 25). Nor has she responded that she made an application under Regulation 3.51 for service without a security deposit or that she would have qualified for such credit. She does affirmatively state, however, that she was never told that one-half of the security deposit was required and that credit terms could be arranged for payment of the balance. (*Id.* at 28).

As to plaintiff's individual claim, defendant's motion for summary judgment shall be denied. As to plaintiff's claim that she was an applicant for service without a security deposit, however, the motion must be granted. Plaintiff was not an applicant for such status under Regulation 3.5. She was not denied status under that section and was not entitled to notice of reasons for denial. Regulation 3.51 g & h.

Even if plaintiff had been entitled to written notice and received none, she sustained no damage since she was not entitled to a no-security deposit credit status.

Plaintiff had no prior credit history (Affidavit, Eileen Findlay, p.2, Plaintiffs' Exh. 14, attached to Motion for Partial Summary Judgment), no PGW customer service history and supplied no credit references. She had no employment and depended in part upon a source of income that she would not disclose even at the time of her deposition. (*Id.* 48–49). A student loan from Temple University was the "credit" that she had, and that was being paid by an unknown source, other than herself. (*Id.*). She would not have been eligible for service without a security deposit, therefore, under the existing Regulations.

With respect to the requirements of Regulation 3.52, there is a genuine material factual dispute as to whether plaintiff was given an informed opportunity to pay the required security deposit of $68, in April, 1984, a half down and the balance over a total of 60 days. There is also a factual dispute as to whether she had the ability to pay $34.00 immediately had she known it was required. That she had the ability to pay the $34.00 security deposit after she obtained an attorney warrants an inference that she could have paid that sum in April, 1984.

As to the prior occasions of alleged rejection by PGW, however, it is evident from plaintiff's deposition testimony that she would be unable to testify at trial say that she was not given written information as to the amounts of the deposits required. She cannot, therefore, say that those writing would not have advised her of the delayed payment terms of fifty percent of the deposit.

The individual claim of Leftwich will be permitted to proceed, except as dismissed here.[34] However, I find that she is an inadequate representative of the purported subclass. First, her testimony is hardly supportive of the proposition that there was a routine denial of rights to which she and others similarly situated were entitled under PGW rules and the Philadelphia Gas Commission Regulations 3.51 and 3.52. Her failure of memory demonstrates that she may not have a meritorious claim and that her case and circumstances are not likely to be representative of purported class members who allegedly do.

## CLASS CLAIMS GENERALLY

■ Named plaintiffs, by their attorneys, have sought the certification of a class which is comprised of:

1) All persons who have been or who in the future may be denied essential gas

---

**34.** Leftwich's claim as to credit without security deposit is dismissed as well as parts of the claim that suggests that she was improperly denied service on occasions prior to April, 1984.

service for arbitrary and capricious reasons;

2) All persons who have been denied or may in the future be denied essential service, for all reasons other than non-payment, without a prompt and adequate procedure by which the basis of the denial is made known and can be contested either before or after service is denied.

*See*, Plaintiffs' Motion for Class Certification. Generally, these proposed classes are so amorphous and broad as to defy definition. For this reason alone the motion must be denied. To the extent that there are subclasses that could be carved from the named plaintiffs' claims, I have found either that the asserted legal bases are erroneous or that they are inadequate class representatives because their individual claims predominate over any common issues of fact.

With respect to the PGW's admitted past practice of giving notice orally to persons for denial or shut-off of service, and advice as to appeal rights if requested, there is no need for future injunctive relief in view of newly adopted rules and regulations. As to a possible class of persons previously denied service under these circumstances, the named plaintiffs are inadequate representatives because the purported class would consist largely of persons who could possibly be charged with criminal offenses. Class members would have to decide individually whether to waive or invoke their Fifth Amendment privileges against self-incrimination. These decisions destroy the typicality and commonality of the issues as required under Fed.R.Civ.P. 23(a). As to the purported class of persons who may have been required to post the full amount of a security deposit before service was provided, this has not been shown to be a practice. PGW has a rule which provides to the contrary, and the numerosity element of Fed.R.Civ.P. 23(a) has not been met.